NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0642n.06
Filed: August 1, 2005

No. 04-5583

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KATHY CANTRELL,

      Plaintiff-Appellant,

v.

NISSAN NORTH AMERICA INC.,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

                                          /

BEFORE:    KEITH, MERRITT, & CLAY, Circuit Judges.

      CLAY, Circuit Judge. Plaintiff, Kathy Cantrell ("Cantrell"), appeals from the district court's grant of summary judgment to Defendant, Nissan North America, Inc. ("Nissan"), on Cantrell's claims that 1) Nissan discriminated against her by failing to reasonably accommodate her disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and 2) Nissan terminated her employment in retaliation for her filing of an charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). For the reasons that follow, we **AFFIRM** the district court's grant of summary judgment to Nissan on Cantrell's discrimination claim, but **REVERSE** and **REMAND** her retaliation claim for trial.

**BACKGROUND**

**I.** **Facts**

Cantrell was employed as a technician at an automobile manufacturing plant operated by Nissan in Smyrna, Tennessee from March 15, 1992 until December 6, 2002. Two trends in her ten-year career at Nissan are particularly relevant here: her recurrent medical problems and Nissan's comprehensive accommodation of them; and her repeated disciplinary problems, which Nissan tolerated for years until finally terminating her employment only two months after she filed an EEOC complaint against the company.

**1.** **Cantrell's medical problems and Nissan's attempts to accommodate them**

In 1993, Cantrell's family physician diagnosed her with depression and being subject to panic attacks, and prescribed medication to treat these problems. Cantrell has taken medication and received counseling since that time. In 1994, Cantrell was hospitalized as a result of her depression for approximately two weeks. She has not been hospitalized for depression since. Cantrell avoids crowds, but she is able to drive, attend church regularly, and take care of household chores such as cooking, cleaning, and laundry. Cantrell also suffers from a sleep disorder which causes her to either sleep too much or too little. In 2002, she was permitted a one-month leave of absence in order to participate in a sleep study.

As will be explained in greater detail below, Cantrell had many interpersonal problems with her co-workers, some of which became so troubling to her that in late 1998, both her personal psychologist and a Nissan doctor imposed restrictions which barred her from working with several individuals. Nissan accommodated these restrictions by assigning Cantrell only to work groups where she would not be required to come into contact with those individuals.

On June 18, 1999, Cantrell began a leave of absence due to a non-work related knee injury. She remained on leave until December 10, 1999. When Cantrell returned, her physician placed limitations on her ability to squat, crouch, and step up and down. Nissan identified a job rotation within her work group that satisfied those restrictions. In October 23, 2001, Cantrell advised Nissan that additional restrictions regarding her knee had been imposed. Nissan contends that there was only one work group where Cantrell could work within these restrictions. Cantrell disputes this, but agrees that she could not work in the group identified by Nissan because it included one of the individuals with whom Cantrell was restricted from working. She was therefore put on a leave of absence. In February 2002, Cantrell's doctor submitted new restrictions, which Nissan determined could be accommodated in Cantrell's current assignment, and she returned to work.

In April 2002, it was Cantrell's turn, under Nissan's seniority system, to rotate into the "Sealer, System 2" unit. Every other technician in her group had previously rotated into Sealer. Previously, Cantrell had avoided rotations into Sealer because of the restrictions concerning with whom she could work. Co-workers regarded this as unfair because Sealer is perceived to be a difficult job. On June 1, 2002, Cantrell advised company managers that Dr. Williams had approved her to work in Sealer, and that she was willing to try to work in Sealer. Nissan medical staff evaluated her restrictions and her willingness to try to work in Sealer, and agreed to permit the transfer on a temporary basis. Cantrell then began working in Sealer. In an effort to provide a more relaxed and familiar workstation, her manager, Andy Travis ("Travis"), arranged for another technician to work in Sealer across the line from Cantrell. Travis escorted Cantrell to her assigned job, and watched her perform the job for several minutes. He assured her that he would check on

her periodically, and asked if she was okay before leaving, to which she responded affirmatively. However, shortly after Travis left, Cantrell began to experience another panic attack as a result of being in close proximity fo her former work group, although she did not see any of the employees from whom she had been restricted. Following this incident, Nissan made no further attempt to have Cantrell work in Sealer, System 2.

Following a disciplinary problem, Cantrell was transferred to a new work group on July 31, 2002. Cantrell's new group, Sealer, System 1, did not include any of the technicians from whom she was restricted, and was in an entirely different location. However, Cantrell did not report to her new assignment, but instead went on another leave of absence. Cantrell claimed that she had begun to experience another panic attack and could not work because two individuals from whom she was restricted were working in the plant where her new assignment was located.

Cantrell returned to work on November 13, 2002. On November 18, 2002, Cantrell was asked if she would participate in Nissan's vehicle evaluation program, where employees look over cars as if they were at a dealership, by checking over the finish of the car, the lights, the radio, and other functions, and then test-driving the car on a track. Cantrell agreed, but suffered another panic attack after viewing the video shown to employees participating in the program. Cantrell was referred to Nissan's medical clinic and then sent home. She was released to return to work on November 22, 2002.

2.     **Cantrell's disciplinary problems and Nissan's handling of them**

Cantrell's behavior caused numerous problems and resulted in many complaints from other employees during the course of her employment. The first such problem appears to have arisen

4

thirteen months after she began working at Nissan, when she was cited for inappropriate workplace behavior for making unwelcome physical contact with a coworker on two separate occasions.

In February 1995, co-worker Angela Link complained to the paint plant's Human Resources Department that Cantrell was engaging in inappropriate physical contact and intimidating her coworkers for an extended period of time. The next month, Cantrell's then-area manager, Russell Rigsby, reported that Cantrell had confided to him that she planned to murder someone, and had told him "I'm so mad I could kill someone. I could understand how someone could come into a place like this and kill people," and said "I'm going to beat the shit out of Angela [Link] after her baby is born." Nissan then placed Cantrell on medical leave until she could demonstrate that she was not a threat.

Nissan authorized Cantrell to return to work on June 1, 1995. In August and September 1995, Cantrell was counseled by several Nissan managers about her "finger pointing, accusations, and intimidation." The next July, Ron Taylor, who was Cantrell's area manager at the time, reported that she was making sexual comments to him at work and in phone calls to his home.

In October 1996, Patrick Link, Angela Link's husband, complained to Nissan that Cantrell was threatening him and others at work, and had confronted him in the parking lot. On October 25, 1996, Jim Bowles ("Bowles"), section manager for the paint plant, recommended that Cantrell be reassigned to another work group to give her a "fresh start." Management agreed and moved her to a new work group. Nissan does not normally transfer an employee to give them "a fresh start," but the company believed this move would be a positive development for Cantrell, especially as her new work group was regarded as a more desirable assignment than her old one.

In November 1996, coworker Sam Garrison reported that Cantrell intimidated, harassed, and stared at him. In January 1997, coworker Jimmy Waisanen reported two incidents of harassing behavior by Cantrell, one toward him and another in which Cantrell called his wife.

On June 20, 2002, Cantrell was involved in a confrontation with a coworker. The next day, another coworker telephoned Nissan to complain about conditions in Cantrell's work group and named Cantrell the "head leader" of the problems. After those incidents, an investigation into Cantrell's work group (consisting of interviews of each of the members of the group) disclosed interpersonal problems. Cantrell agrees that the investigation revealed that some of the technicians perceived Cantrell to be one of the causes of those problems, but disputes that she was, in fact, a cause of problems in her work group. In response to a question about whether they had ever observed intimidation by any of the technicians in the work group, seven of seventeen interviewees named Cantrell. In response to a question about what "would most help your workgroup to become more of a team," eight suggested "moving" or "doing something about" Cantrell.

On July 18, 2002, Cantrell was involved in another incident in which she became "argumentative" with a yet another coworker. Nissan management considered terminating Cantrell, but decided against it. Instead, on July 31, 2002, Cantrell received a written reminder regarding her "inappropriate behavior." The written reminder also informed her that she would be transferred to a new work group effective immediately, and was warned that any further inappropriate behavior at any time could result in further corrective action including termination of her employment. Bowles testified that in his experience at Nissan, such a second "fresh start" was unprecedented.

As noted above, Cantrell did not report to her new assignment, but instead went on another leave of absence.

While on leave, Cantrell filed a charge of discrimination with the EEOC. That charge was dismissed on October 30, 2002. Cantrell returned to work on November 13, 2002. She met with Bowles and Terry Parks ("Parks"), the Paint Operations Section manager. They informed her she was being given a second fresh start and that any further inappropriate behavior would result in her termination. Parks testified that his impressions of Cantrell at the meeting were that "she handled herself well. She was a pleasant person." During her first days back, Parks would check in with Cantrell regularly to make sure things were going smoothly. In his view, Cantrell "seemed to be very pleasant, very happy where she was working, did not really have problems, was adapting well." Her area manager told Parks that Cantrell was doing fine.

On November 25, 2002, the week after Cantrell suffered a panic attack upon viewing the training video for the vehicle evaluation program, Bowles prepared a memorandum recommending Cantrell's termination. The memo outlined Cantrell's "history of gross misconduct." Bowles regarded the driving program incident as another in a long list of occasions where Cantrell appeared to be "trying to pick her jobs," and constituted yet more "inappropriate behavior." Nissan management approved the termination, and at a meeting on December 6, 2002, Cantrell was informed that she was being terminated because of a history of gross misconduct. Cantrell unsuccessfully appealed her termination through Nissan's peer review process.

## II.    Procedural History

Cantrell filed this suit in the United States District Court for the Middle District of Tennessee on January 28, 2003. Her complaint alleged that Nissan had violated the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, by failing to reasonably accommodate her disability, and that Nissan terminated her employment in retaliation for her filing a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). Nissan filed an answer on March 17, 2003, and a motion for summary judgment two days later. On April 25, 2003, Nissan filed an amended motion for summary judgment.

On July 18, 2003, the district court denied Nissan's motion for summary judgment, without prejudice to refile. Nissan filed a renewed motion for summary judgment on November 11, 2003. Cantrell filed a response on December 19, 2003. On April 28, 2004, the district court entered an order and memorandum granting summary judgment to Nissan. The district court found that while Cantrell had raised a genuine issue of material fact as to whether she was disabled within the meaning of the ADA, she had not met her burden of showing that she was qualified for her position. With respect to Cantrell's retaliation claim, the district court found that Cantrell could not make out a *prima facie* claim because she had not established a causal link between the filing of her EEOC claim and her termination. The district court further found that even if Cantrell had established a *prima facie* case of retaliation, Nissan had proffered a legitimate non-discriminatory explanation for its decision to terminate Cantrell, and she had not shown that explanation to be pretextual.

Cantrell filed a notice of appeal to this Court on May 13, 2004.

## DISCUSSION

**I.    The district court did not err in granting summary judgment on Cantrell's discrimination claim**

8

Having reviewed the memorandum and order entered by the district court in this case on April 29, 2004, we conclude that the district court correctly granted summary judgment to Nissan on Cantrell's discrimination claim under the ADA, 42 U.S.C. § 12101, *et seq.*. Given the district court's comprehensive explanation of its grant of summary judgment, no jurisprudential purpose would be served by an exhaustive analysis of that issue here. Rather, a short discussion will suffice.

As the district court stated, in order to establish her claim that Nissan did not reasonably accommodate her alleged disabilities (depression and panic attacks), Cantrell needed to show that 1) she has a disability, 2) she is qualified to perform the job requirements with or without reasonable accommodation, and 3) she was denied a reasonable accommodation. *Penny v. United Parcel Service*, 128 F.3d 408, 414 (6th Cir. 1997).

Although we find that it is a close call as to whether Cantrell succeeding in establishing that she was disabled under the statute, we agree with the district court's conclusion that, assuming she was disabled, Cantrell failed to show that she was qualified for the position because of her attendance problems and her inability to get along with her co-workers. Furthermore, we reject the suggestion that Nissan did not reasonably accommodate Cantrell's disability; to the contrary, until she was terminated, Nissan made impressive efforts to accommodate her and to comply with restrictions imposed by her doctors. The district court correctly granted summary judgment to Nissan on Cantrell's reasonable accommodation claim.

**II. The district court erred in granting summary judgment on Cantrell's retaliation claim**

We cannot agree with the district court's determination that summary judgment was also appropriate with respect to Cantrell's claim that Nissan retaliated against her on the basis of her EEOC filing, and we therefore engage in a more extended discussion of that issue here.

### 1. Standard of Review

We review *de novo* a district court's grant of summary judgment, applying the same legal standard as the court below. *Equitable Life Assur. Soc'y v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). We must consider the factual evidence and draw all reasonable inferences in favor of the non-moving party. *Verizon North Inc. v. Strand*, 367 F.3d 577, 581 (6th Cir. 2004). A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party. *Skousen v. Brighton High School*, 1305 F.3d 520, 526 (6th Cir. 2002).

### 2. Analysis

### a. Cantrell's *prima facie* case

In order to establish a *prima facie* case of unlawful retaliation, a plaintiff must show: 1) that she engaged in a Title VII-protected activity; 2) that her employer knew of that activity; 3) that the plaintiff experienced an adverse employment action; and 4) that a causal connection exists between the protected activity and the adverse employment action. *Little v. BP Exploration & Oil Co.*, 265

F.3d 357, 363 (6th Cir. 2002) (citing *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

There is no dispute that Cantrell engaged in a protected activity by filing a claim of discrimination with the EEOC on September 5, 2002, that Nissan was aware of this activity, and that Cantrell experienced an adverse employment action when she was terminated on December 6, 2002. Therefore, the only dispute is whether Cantrell has set forth a *prima facie* case of retaliation in regard to the fourth prong of the standard, which requires her to establish a causal connection between her EEOC filing and her termination.

A causal connection is established by the presentation of evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (citations omitted). While "no one factor is dispositive in establishing a causal connection," we have held that evidence that a defendant employer treated a plaintiff employee differently from identically situated employees who did not engage in protected activity is relevant. *Allen v. Michigan Dept. of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999) (citing *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir.1987)). Applying similar logic, we have implied that where an employer treats an employee differently after she asserts her rights under the ADA than before she had done so, a retaliatory motive may be inferred. *See Walborn v. Erie County Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998). Finally, "[a]lthough temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence, closeness in time between the filing with the EEOC and the adverse employment action

is relevant and may evince the employer's intent." *Johnson v. University of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

The facts of Cantrell's career at Nissan, recounted above, show that for years Nissan tolerated Cantrell's inability to get along with her co-workers, reflected in incidents in which she made threats and unwanted physical contact with others, and that Nissan countenanced what it perceived as Cantrell's attempts to "pick her jobs" by invoking her restrictions to avoid certain assignments. It was only after Cantrell's return to work in November 2002, having filed her EEOC charge two months earlier while on leave that Nissan determined that her "history of gross misconduct" required her termination. Because Cantrell filed the complaint while on leave (thus presumably making it difficult for Nissan to fire her at that time), we conclude that the appropriate measure of temporal proximity in this case is from November 13, 2002, the date that she first returned to work after filing the EEOC complaint, until the date of her termination on December 6, 2002.

In our view, Cantrell has raised an inference that her termination may have been retaliatory for the filing of her EEOC complaint. Cantrell's engagement in the protected activity (again, as measured by the time of her return to work following the EEOC filing) came only three weeks before the decision to terminate her. Furthermore, the event that allegedly triggered the decision to fire her – her failure to successfully participate in the vehicle evaluation program – was far less serious than any of the many previous disciplinary problems Cantrell presented.[1] The fact that

---

[1]We are reluctant to compare Cantrell's failure to complete the vehicle evaluation program, which was apparently due to the fact that she suffered a debilitating panic attack, to the incidents in which she threatened or menaced her coworkers. However, we do so because Cantrell has chosen

Cantrell was treated so differently before and after her EEOC filing, particularly when coupled with the close temporal proximity between the EEOC filing and her termination, suffice "to raise the inference that her protected activity was the likely reason for the adverse action." *Avery Dennison Corp.*, 104 F.3d at 861. She has therefore succeeded in making out a *prima facie* case of retaliation.

**b.      Nissan's proffered legitimate, non-discriminatory reasons for firing Cantrell, and Cantrell's evidence of pretext**

After a plaintiff has established a *prima facie* case of retaliation, the burden shifts to the defendant "'to articulate some legitimate, nondiscriminatory reason' for its actions." *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant succeeds in doing so, the plaintiff must demonstrate "that a reasonable jury could find by a preponderance of the evidence that the defendant's stated reasons are pretextual." *Id.* at 552 (citing *Wrenn v.Gould*, 808 F.2d 493, 501 (6th Cir. 1987)).

Although the district court reached the opposite conclusion and held that Cantrell had not established a *prima facie* case, it nonetheless went on to consider whether Nissan had offered a legitimate, non-discriminatory reason for its decision to terminate Cantrell. The district court found that Nissan had done so. We agree, although we might frame those reasons differently than the district court did. The district court found that the fact that Cantrell was able to complete only six shifts after her return to work on November 13, 2002, before suffering the panic attack spurred on by her participation in the vehicle evaluation program, provided a legitimate, non-discriminatory

---

not to argue that Nissan fired her because she suffered a panic attack (and to make a corollary argument that such a firing was impermissible under the ADA), but instead argues that Nissan fired her in retaliation for her EEOC filing.

reason for terminating her employment. Nissan has characterized its reasons for firing Cantrell more broadly, explaining it its brief that "[t]he record is clear that Cantrell was terminated not merely because she failed to complete the Vehicle Evaluation Program after agreeing to do this specific task, but because of her entire history of inappropriate conduct and the inability to do the jobs to which she was assigned or agreed to perform." Def. Brief at 50.

In order to show that a proffered legitimate, non-discriminatory reason for an adverse employment action is pretextual, a plaintiff must show "'either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge.'" *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993)) (emphasis in original). It is clear that Cantrell cannot prove pretext either by showing that the proffered reasons had no basis in fact or that they were insufficient to motivate discharge. She must instead show that the proffered reasons did not actually motivate her discharge. In other words, she must show "circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Id.* (emphasis in original).

We hold that the same circumstances which established a causal connection between Cantrell's protected activity and her termination also serve as sufficient evidence to meet this test.[2]

---

[2]We note that reliance on the same evidence to establish a *prima facie* case and to rebut a proffered legitimate, non-discriminatory reason for Cantrell's termination appears at first blush to be barred by *Manzer*. In *Manzer*, we held, in the context of a straightforward discrimination claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, that in order to show that a proffered reason did not actually motivate an adverse employment action, "the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of . . . discrimination." *Id.*

Again, Nissan showed remarkable patience for Cantrell's inappropriate behavior and repeated absences for over ten years, and then fired her abruptly only three weeks following her return to work after she engaged in a protected activity. The event which precipitated Cantrell's firing pales in comparison to some of the far more egregious behavior that she had previously engaged in, and for which she was not terminated. A jury could reasonably conclude that Cantrell's failure to complete the vehicle evaluation program was not, as Nissan would have it, the straw that broke the camel's back, but rather that Nissan simply seized on it as the first available excuse to fire Cantrell after her EEOC filing. We therefore must reverse the district court's grant of summary judgment to Nissan on Cantrell's retaliation claim.

It is not lost on us that some might view our holding today as punishing Nissan for showing too much patience with Cantrell. After all, had Nissan simply fired Cantrell in 1995, when she

---

However, the rule of *Manzer* cannot logically be extended to a retaliation case. In *Manzer*, the elements of the *prima facie* case were 1) membership in a protected class, 2) an adverse employment action, 3) that plaintiff was qualified for the position, and 4) that a person outside of the protected class replaced, or was selected over, the plaintiff. 29 F.3d at 1081. None of those elements overlaps with a showing that the proffered reason for the adverse employment action was not the actual reason.

In contrast, in a retaliation claim, the *prima facie* case requires that the plaintiff show, among other things, that a causal connection exists between her protected activity and the adverse employment action. Such a showing, if sufficiently strong, also necessarily rebuts a proffered legitimate, non-discriminatory reason for the adverse action. The overlap between the causal connection requirement and a showing that the proffered reason for termination was not the actual reason is implicitly recognized in our case law, which permits both to be proven by the same type of evidence. *Compare Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("evidence that defendant treated the plaintiff differently from similarly situated employees . . . is relevant to causation"), and *Pascual v. Anchor Advances Products, Inc.*, No. 96-5453, 1997 WL 397221 (6th Cir. July 10, 1997) ("Brown could not prove that Anchor's reason for terminating her was not the actual motivating reason for her discharge. As noted above, every employee [who engaged in the same misconduct as Brown] was released from Anchor's employment").

15

threatened to beat up a coworker, or in 1996, when multiple coworkers reported that Cantrell was harassing and intimidating them, Cantrell might have had a hard time alleging and proving that her termination was wrongful. We would simply emphasize that a jury is free to conclude that it was the accumulation of those and similar events that caused Nissan to fire Cantrell, and if it does so, Nissan will not be liable for any wrongdoing. But if it was Cantrell's filing of the EEOC complaint that caused Nissan to finally lose its patience with her, then she is protected under the law, no matter how objectionable her prior behavior in the workplace.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** and **REMAND** in part.

**MERRITT, Circuit Judge, concurring in part and dissenting in part.** I agree with the Court on all points except that I do not find that the Plaintiff has demonstrated that Nissan's stated reasons for discharge were pretextual. Nissan has come forward with a legitimate non-discriminatory reason for Cantrell's termination. In July 2002, Nissan reprimanded Cantrell for her "inappropriate behavior" up to that point, warned her that any further inappropriate behavior could result in termination of employment, and reassigned her to a new group. Rather than reporting to her new assignment, Cantrell took a leave of absence. When she finally did report to her new post, she worked there for less than two weeks before the same old problems ensued. Nissan contends that this latest incident in light of her continuing inability to do the jobs to which she was assigned and her "history of gross misconduct" motivated the company to discharge Cantrell. I agree with my colleagues that the reason proffered by Nissan both had a basis in fact and was sufficient to justify Cantrell's discharge. Majority Opinion at 14. I disagree with the Court's conclusion, however, that the Plaintiff can demonstrate the existence of "circumstances which tend to prove that an illegal motivation was <u>more</u> likely than that offered by the Defendant." *Id.* (quoting *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)) (emphasis in original).

My colleagues simply speculate that while Nissan had a legitimate and sufficient basis to terminate Cantrell, a jury could find they were not actually motivated by this legitimate reason. Instead, they find that Cantrell can show that it is "more likely than not" that Nissan fired Cantrell in response to her EEOC filing. The Court holds that a jury could find it more likely than not that the nondiscriminatory reasons justifying termination were merely an excuse disguising the company's retaliation. The only stated reason for this finding is that Nissan did not terminate

17

Cantrell earlier when her behavior was more egregious. Majority Opinion at 15. My fear is that the majority's opinion makes it nearly impossible for an employer to terminate an employee if that employee has filed a claim with the EEOC, even if it is clear that the employer has a valid reason to terminate the employee. An EEOC filing alone should not serve as an insurance policy against discharge when the reasons for the employer's actions are as strong as they are in this case.

The most I can say is that the facts here create no more than a state of evidentiary "equilibrium" on this point. Cantrell is unable to show that "it is more likely than not" that Nissan's proffered reasons are simply pretextual. Plaintiff has the burden, and she has not carried it. I would affirm the District Court's decision granting summary judgment on the plaintiff's retaliation claim.