NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0458n.06

No. 09-2260

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 07, 2011*

LEONARD GREEN, Clerk

PATRICIA PETTIT,    )
                    )
　　Plaintiff-Appellant,    )
                    )    ON APPEAL FROM THE
v.                  )    UNITED STATES DISTRICT
                    )    COURT FOR THE EASTERN
STEPPINGSTONE, CENTER FOR THE    )    DISTRICT OF MICHIGAN
POTENTIALLY GIFTED and KIYO MORSE,    )
                    )        OPINION
　　Defendants-Appellees.    )


**Before: MARTIN and STRANCH, Circuit Judges, and THAPAR, District Judge.**[*]

**JANE B. STRANCH**, Circuit Judge.  This is a case brought by Pettit against her prior employer, Steppingstone, and its headmistress, Morse, alleging retaliation under the Fair Labor Standards Act.  The district court granted summary judgment to the defendants, and Pettit timely appealed that order.  We affirm.

I.　　**Background**

A.　　**Factual Background**

Patricia Pettit began working for Steppingstone in January 2006 under a part-time barter arrangement whereby Pettit's salary was credited towards the tuition of her three sons.  Her starting

---

[*]The Honorable Amul Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

title was Director of Admissions, and she also began to serve as Director of Human Resources in the fall of 2006.

All employees at Steppingstone worked under one-year form letter agreements, generally spanning a single fiscal year (August to August). Employees were required to sign a new agreement every year, although often Steppingstone failed to provide new contracts, and employees continued to work anyway. Pettit signed her first letter agreement with Steppingstone in September 2006, which expired in December 2006. She was never presented with a written contract during the 2007 calendar year. Other non-faculty employees signed one-year contracts in August 2007, which had been revised by legal counsel and differed substantially from prior years' versions.

As Director of Human Resources, Pettit suspected two employees were misclassified under the Fair Labor Standards Act ("FLSA"), and in December 2007 she so advised her supervisor and head of the school, Kiyo Morse. Throughout December, Pettit investigated, contacted outside legal counsel for an opinion, and drafted an informative memorandum which she gave to Morse. At the same time, Morse was preoccupied with an event of major concern for Steppingstone, the relocation of the entire campus from the current donated property to a leased property. Morse worried that this relocation would harm enrollment and potentially threaten the school's existence, and so she told Pettit to concentrate on admissions, rather than human resources. In fact, as Morse reminded Pettit in an e-mail in February 2008, she had told Pettit at every meeting since returning from the New Year's break in January 2008 that "I need you to put all your time and energy into admissions."

Hourly employees at Steppingstone were required to keep a "work diary" to catalogue daily activities. In December 2007, Morse reminded Pettit that she was supposed to be keeping a work

diary. Morse asked another employee, Sandra Blay, to lay out specific instructions about the diary in an e-mail to all hourly employees, including Pettit. The e-mail was sent on January 14, 2008. At about that time, Pettit began to press Morse on the perceived FLSA issue.

On January 15, 2008, Pettit brought up the FLSA issue in an office meeting. It appears that this was the only time Pettit and Morse engaged in a face-to-face conversation about her FLSA concerns, as evidenced by a later e-mail from Morse to Pettit asking why, if Pettit wanted to discuss the issue, she never raised it in any of their regular weekly meetings. Instead, Pettit pursued the issue with Morse electronically. That same day she sent the first in a series of lengthy e-mail communications to Morse about FLSA compliance. These e-mails spanned three, four, up to seven pages, single-spaced, and took an increasingly personal and accusatory tone towards Morse.

On February 1, 2008, Pettit sent an e-mail to the Executive Committee of the Steppingstone Board of Trustees which read, in relevant part:

> As your Human Resources Director as well as your Admissions Director, it is my professional opinion that Steppingstone School for Gifted Education has been and continues to be in violation of the Fair Labor Standards Act. I have notified/re-notified school administration regarding the problem numerous times in writing and verbally over the last 8 weeks. Responses indicate to me little interest in coming into compliance at this time. Further, numerous indications are that there is little understanding of the issues so I am unclear that there will ever be interest in coming into compliance.
>
> Should Steppingstone decide to create a Wage and Hour program that is in compliance with the law by February 15, 2008, I will enthusiastically support the decision and work to meet that goal in addition to dedicating myself to our admissions goals. Should Steppingstone decide not to seek the support of professional resources to rectify the problem, as I do not want to be in a position of knowingly working in an organization that is out of legal compliance, I see no choice but to report unlawful activity to the U.S. Department of Labor.

This e-mail developed into the first of several e-mail chains between Pettit, Morse, and/or members of the Board. For three days, Pettit, Morse, and Richard Niemisto, a member of the Executive Committee, engaged in back-and-forth e-mailing about Steppingstone's FLSA compliance, in which Pettit ultimately called into question Morse's ability to make an informed decision. At the same time, Morse and Pettit were engaged in communications on an e-mail chain about the work diary requirement, in which Pettit suggested Morse was spreading gossip about her.

On February 3, 2008, Pettit sent Morse yet another e-mail, copying the entire Executive Committee, in which Pettit complained that Morse failed to deal with all of Pettit's concerns about FLSA compliance. A back-and-forth exchange continued daily between Morse and Pettit, copying the Committee, and on February 5, 2008 Pettit asserted her own FLSA rights in her response e-mail.

> And also, recently now that you've emailed to me that I am 'hourly' which was different than how we were handling what I understood to be an exempt classification and how it would be handled properly on the books . . . , you will owe me – and this is a quick guess – probably over $1000 for work (2007 – doesn't include 2006) you knew I performed but was not put down on my time sheet . . . . There is a two year statute of limitations, I believe, on issues like this.[1]

Subsequent to that, Pettit again e-mailed Morse to point out the flaws and inconsistencies she found in Morse's approach to the FLSA issue and questioned Morse's honesty in relaying information to Pettit. Morse sent Pettit a final message on February 7, 2008 stating, "Dear Pat, I think we'll have to agree to disagree and move on to the issues of admissions, which I repeat, is where the focus needs to be."

---

[1] Pettit believed that she herself had been previously classified as exempt, but that Morse had begun treating her as an "hourly," and presumably non-exempt employee, thus entitling her to overtime pay.

However, Pettit had already made clear to Morse that she did not intend to leave the FLSA issue and focus on admissions, despite Morse's repeated instructions to do so. In a February 3 e-mail to Morse and the Executive Committee, Pettit explains why she would not work as instructed:

> You have let me know that your focus must be on the building issue – very understandable. Unfortunately, as I have indicated to you, that won't be a good defense if a non-compliance charge comes our way . . . . Further, never have I been in a position to have to choose between following the law and following my boss' [sic] direction . . . .
>
> I am also organizationally minded, so that my work focuses on what's right for the organization [sic] will be right for all associated in the long run. In weighing everything out, I came to the very difficult decision to push this issue to the board level.
>
> I have never entertained an 'end run' with any other manager in my career. The communication problems have reared up so strongly externally and internally in the last nine months, that I have felt compelled not once but twice in the last two months.
>
> This is an extremely unpleasant position for me. And an unnecessary waste of time and resources, from my point of view.

Overall, Pettit's e-mails show that rather than focusing on admissions now as instructed and returning to the FLSA issue at a later date, Pettit was spending her work time on a campaign to institutionalize her view of the FLSA and to force the immediate creation of a wage and hour policy in accord with her expectations. Her lengthy communications also extended beyond that purpose to include comments on Morse's capabilities as a supervisor, such as: "Your investment of time in back and forth emails when I am right down the hall is a strong indicator of a problem beyond wage and hour compliance;" and "[T]he information here clearly indicates avoidance, conflict, poor communication and the absence of teamwork at the minimum." Pettit presented this stream of complaint and comment to and about Morse before members of the governing Board.

On February 5, 2008, during this period of debate, Morse presented Pettit with a contract for the remainder of the 2007-2008 year that included new provisions. In August 2007, other non-faculty employees had signed a new contract that had been revised by counsel. The contract proposed to Pettit contained provisions that were unfavorable to her: her human resources duties were removed; it expired on June 20, 2008 rather than at the end of the fiscal year; her schedule was set to specific hours on certain days; and her salary could not be credited towards non-tuition expenses. Pettit did not sign the contract.

On March 11, Morse presented Pettit with a revised contract including additional provisions added by the school's attorney. The new provisions included: a requirement that Pettit report only to Morse; a limitation of Pettit's hours to 20 per week unless "specifically authorized in writing by the Head of School"; a termination clause allowing termination by either party for any reason given 30 days' written notice; a confidentiality provision; a non-compete provision; an arbitration provision; and a provision limiting Pettit's right to sue to 180 days after any actionable event.

Pettit hired her own attorney to negotiate the contract terms, and a number of contract drafts were exchanged. Morse yielded in changing the contract to expire on December 31, 2008 but refused other changes. She gave Pettit a "final" contract on May 5, 2008, and Pettit declined to sign it, instead insisting upon further negotiation.

On May 9, 2008, Pettit showed up for work, but Morse sent two other employees outside to tell Pettit either to sign her contract or turn in her keys. Pettit refused to do either, instead telling her co-workers that she would discuss her contract with Morse. Morse refused to come out to speak

with Pettit, and instead contacted a Board member who sent two uniformed police officers to escort Pettit from the premises.

### B.      Procedural Background

At the conclusion of discovery, Defendants moved for summary judgment. On September 1, 2009, the district court granted summary judgment to the Defendants, finding that Pettit had made her prima facie case of retaliation but failed to prove pretext. Specifically, the court found that Pettit had not presented sufficient evidence to rebut Defendants' legitimate business explanations for the adverse actions taken against her. The district court also found Pettit not to be credible. She timely filed this appeal.

## II.     Analysis

### A.      Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 628 (6th Cir. 2008). Summary judgment is appropriate if the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden of proving the absence of a genuine issue of material fact and its entitlement to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be discharged by showing that the nonmoving party has failed to establish an essential element of his case, for which he bears the ultimate burden of proof at trial. *Id.* To refute such a showing, the nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson v. Liberty Lobby*,

477 U.S. 242, 252. All facts, including inferences, are viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.      The Sufficiency of Pettit's Evidence under the Burden-Shifting Analysis**

The Fair Labor Standards Act proscribes retaliation by "discharg[ing]" or otherwise "discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act." 29 U.S.C. § 215(a)(3) (2010). Claims of FLSA retaliation are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Adair v. Charter Cnty. of Wayne*, 452 F.3d 483, 489 (6th Cir. 2006).

> On a motion for summary judgment, the district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry. Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that a prima facie case of discrimination has been established. The defendant must then offer sufficient evidence of a legitimate, nondiscriminatory reason for its action. If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.

*Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (internal citations and quotation marks omitted). Pettit asserts error by the district court at every stage of the *McDonnell Douglas* inquiry.

**C.      Plaintiff's Four-Part Prima Facie Case**

To make her prima facie case of retaliation, the plaintiff must prove that (1) she engaged in protected activity under the FLSA; (2) her exercise of this right was known by the employer; (3) the

employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Adair*, 452 F.3d at 489.

### 1. Protected Activity

A prototypical claim of FLSA retaliation involves a complaint of FLSA violation made in the interest of employee(s), generally regarding some aspect of one's own pay or the pay of other employees. Under FLSA retaliation law, Pettit's situation is different because her complaints were made in her capacity as Director of Human Resources, alleging misclassification of other employees and lack of a company-wide wage and hour policy. To the degree that Pettit's FLSA complaints were made in the course of performance of human resource job duties assigned to her and undertaken for the purpose of protecting the interests of the employer, they do not constitute protected activity under § 215(a)(3).[2]

Under FLSA retaliation law, there is a legally cognizable distinction between the performance of job duties and the assertion of one's own FLSA rights or the rights of others. For an employee specifically tasked with personnel or human resources duties, dealing with FLSA compliance is part of the job, to be undertaken with the interests of the employing company in mind.

---

[2] While the Sixth Circuit has not addressed the issue of distinguishing job performance from protected activity, district courts within the Circuit have come to the conclusion that complaints within the scope of one's job duties cannot be protected activity. *See*, *e.g.*, *Pettit v. Steppingstone Ctr. for the Potentially Gifted*, No. 08-12205, 2009 U.S. Dist. LEXIS 78262 (E.D. Mich. Sept.1, 2009); *Samons v. Cardington Yutaka Techs, Inc.*, No. 2:08-cv-988, 2009 U.S. Dist. LEXIS 30398, *15-16 (S.D. Ohio April 7, 2009); *Robinson v. Wal-Mart Stores, Inc.*, 341 F. Supp. 759 (W.D. Mich. 2004). The other Circuits that have addressed the issue have reached the same conclusion. *See*, *e.g.*, *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 627-28 (5th Cir. 2008); *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102 (1st Cir. 2004); *EEOC v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998); *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486-87 (10th Cir. 1996).

An assertion of FLSA rights, on the other hand, will normally be specific to one or more employee(s) or a class of employees and will usually be made in the interests of that employee, group or class of employees and, thus, may be adverse to the employer's interests.

In this case, Pettit brought her concerns about Steppingstone's FLSA compliance to Morse's attention on several occasions, primarily in January and February 2008. Pettit argues that her repeated disclosures to Morse and the Steppingstone Board *all* constitute protected activity under § 215(a)(3). However, the district court determined that only one of Pettit's complaints, the February 1, 2008 e-mail to the Executive Committee, constituted protected activity. We agree that Pettit's invocation of threatening language took her February 1 complaint outside the realm of job performance. Although she suggests she is acting in her official capacity ("As your Human Resources Director . . . , it is my professional opinion that . . ."), she is clearly stepping outside her official capacity, as any action resulting from this complaint would be adverse to Steppingstone.

Additionally, we find Pettit's February 5 e-mail to Morse and the Executive Committee also constitutes protected activity because Pettit asserts a violation of her own FLSA rights, namely Steppingstone's failure to pay her approximately $1,000 in overtime pay. Pettit also implies she could institute legal action, an act clearly in her own interest and, thus, outside her job duties.

The complaints made by Pettit prior to the February 1 e-mail are not protected activity, as they were undertaken on behalf of the interests of the school and neither assert individual or group rights nor threaten action adverse to the school. Instead, Pettit's requests were for Steppingstone to change its wage and hour policy, one of her responsibilities as Human Resources Director. Pettit now argues that she was not responsible for Steppingstone's FLSA compliance while employed with

the school. However, Pettit's basis for bringing this issue to the school's attention was her insistence, in her stated capacity as Human Resources Director, that Steppingstone immediately comply with her determinations regarding application of the FLSA.

Finally, the Defendants argue that even if Pettit's threat to report violations would ordinarily constitute protected activity, in this case the threat is not protected by the FLSA anti-retaliation provision because Morse had already remedied the violation by consulting outside counsel. It is unnecessary to address that issue here. As this Court has stated previously, corrective action is appropriately considered under the causal connection element of the plaintiff's prima facie case and is not relevant to the issue of whether the plaintiff engaged in protected activity. *Moore v. Freeman*, 355 F.3d 558, 562-63 (6th Cir. 2004).

Pettit satisfied step one of her prima facie case: she engaged in protected activity under the FLSA in her February 1 and 5 emails.

### 2. Exercise of Right

The parties agree that Steppingstone was aware Pettit claimed to be exercising her rights under the FLSA. Pettit established step two.

### 3. Adverse Action

"The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68 (internal citations and

-11-

quotation marks omitted). To be materially adverse, an adverse action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886 (6th Cir. 1996) (internal citations and quotation marks omitted). Though not by way of limitation, this Circuit has enumerated certain employment actions that are usually indicative of material adversity, including "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461-62 (6th Cir. 2000) (internal quotation marks omitted).[3]

Pettit argues that Defendants took a number of adverse actions against her. Specifically, she points to: (1) termination; (2) her children's "de facto expulsion" from school; (3) Steppingstone's insistence on a revised contract with adverse conditions, including removal of human resources duties; (4) denial of a raise; (5) reduction in number of work hours unless authorized; (6) removal of children from enrichment classes; (7) disallowing Pettit to barter for enrichment classes; (8) imposing new timekeeping requirements; and (9) elimination of a just cause provision in her employment contract. On appeal, Defendants concede that two of the actions taken against Pettit were materially adverse: (1) the removal of Pettit's human resources duties, and (2) the contract term prohibiting Pettit from bartering for extended day service for her children.

---

[3] However, as the Court held in *Burlington*, for the purpose of retaliation, adverse actions are not limited to employment actions, but encompass a broader range of actions, even outside the employment context, that harm an employee. 548 U.S. at 61-67.

Termination is a materially adverse action against an employee. *See, e.g., Bowman*, 220 F.3d at 462. Defendants' argument that they never terminated Pettit, that she voluntarily quit by not signing her new contract, is unconvincing. A significant change in the terms of employment imposed by an employer may constitute a constructive discharge. However, requiring an employee to sign an employment agreement is not actionable if there are no materially adverse changes to the terms of the employment in the agreement. *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987). Because certain terms of the various contracts presented to Pettit in 2008 differed materially and adversely from her prior agreements with Steppingstone, the insistence that Pettit sign the contract constitutes an adverse employment action.[4]

While Defendants have conceded the adverse nature of disallowing Pettit to barter for extended day care services, they do not concede adversity with regard to Pettit's claim that she was no longer allowed to barter for after-school enrichment classes. The evidence demonstrates that the ability to barter for these classes was never part of Pettit's arrangement with Steppingstone. Pettit alleges that, prior to her February 1 e-mail, her children were routinely allowed to take these classes by offsetting the cost against her hours. However, the Defendants have offered invoices and canceled checks indicating that Pettit paid for the classes in 2006 and 2007. Morse states that one class was mistakenly credited against Pettit's earnings in 2008 due to error by the office administrator. Because Pettit did not have the ability to barter for enrichment classes before her

---

[4] We consider Pettit's argument that the elimination of the just-cause provision of her contract constitutes an adverse action to be subsumed in the requirement that Pettit sign a contract.

protected activity, Defendants' refusal to allow her to barter after her complaints cannot constitute adverse action.[5]

The remainder of the adverse actions alleged by Pettit on appeal - the reduction of her hours and the imposition of time-keeping requirements - do not qualify as materially adverse. First, we are not convinced that the 20-hour-per-week restriction constitutes a change at all. Pettit's 2006 contract set her hours at less than 10 per week, specifically on Tuesdays, Wednesdays, and Thursdays from 9:00 until 11:30 a.m., "to be expanded by mutual agreement as needs dictate." The new contract stated that Pettit's work hours were to be limited to 20 per week unless Morse gave approval to exceed that number. Pettit's relationship with the school had always required agreement of the school for expansion of hours over a minimal number. Therefore, the contract provision does not qualify as a new materially adverse condition imposed by the employer.

The time-keeping diary requirements fail also. They were requested prior to Pettit's undertaking protected activity and were required of other employees. Even if time keeping were considered a new condition, it affected neither Pettit's position nor compensation and is the type of inconvenience that falls short of an actionable level of material adversity.

Because Pettit has established some of her allegations of adverse action, she satisfies step three of her prima facie case.

---

[5] We treat Pettit's argument that Defendants' pulling her children from their enrichment classes is an adverse action as being part and parcel of this argument that the loss of the enrichment classes as a benefit of employment is an adverse action.

### 4. Causal Connection

"[T]o establish the element of causal link a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal quotation marks and citation omitted). At this stage, the plaintiff's burden to show causation entails "requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *Id*. The burden is easily met.

Closeness in time between the protected activity and the adverse action is strong evidence, but "temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010). However, temporal proximity combined with other evidence of "retaliatory conduct" can be enough to prove this element of a plaintiff's prima facie case. *Id*. One example of such sufficient, additional evidence is evidence of disparate treatment. *See Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 105-06 (6th Cir. 2005).

Pettit has met her burden to prove causal connection.[6]  She was given an employment contract containing a number of unfavorable terms only 4 days after her February 1 e-mail and on the same day as her February 5 e-mail, thus creating an inference of retaliation through temporal proximity.  Additionally, the parties agree that the contracts presented to Pettit differed materially from those presented to Pettit in previous years and to other employees the same year.  Thus, Pettit has presented sufficient proof of causation to satisfy the fourth step of her prima facie case.

### 5.    Direct Evidence as Alternative to Inferential Evidence of Retaliation

In addition to arguing that she has offered sufficient evidence of prima facie retaliation to shift the burden to the Defendants under *McDonnell Douglas*, Pettit alternatively argues the district court erred in applying the *McDonnell Douglas* framework to her claim.  She alleges she provided direct evidence of retaliation, which removes her claim from the burden-shifting framework.  The evidence presented by Pettit, while applicable to her prima facie case, is not direct evidence of retaliation or retaliatory motive.

"Direct evidence is evidence, which if believed, does not require an inference to conclude that unlawful retaliation motivated an employer's action."  *Spengler*, 615 F.3d at 491.  In other

---

[6] Defendants argue that they took action to correct any FLSA problem, negating Pettit's showing of causal connection.  The corrective action asserted is a conversation between Morse and one member of the Board, Nancy Furman, who has a master's degree in human resources.  According to Furman's deposition, Morse asked Furman if she knew the laws for overtime.  Furman responded that anything over forty hours a week was time and a half by law unless the employee is exempt.  Furman could not remember the month or year this conversation took place.  Because there are genuine factual issues as to when this conversation took place and whether it constituted "corrective action," granting summary judgment on this ground would be inappropriate.

words, direct evidence requires the drawing of the conclusion that the defendant retaliated against

the plaintiff. *Id*. In this case, Pettit points to an e-mail from Morse in which she tells Pettit that her

hours will be capped at 20 per week "until the FLSA issues have been resolved."[7]

This e-mail is germane to proving Pettit's prima facie case and does raise questions; however,

it is insufficient to constitute direct evidence of retaliatory intent because, standing alone, it requires

an inference of intent to reach the conclusion of unlawful motive. Pettit infers that Morse was

impermissibly motivated by Pettit's prior complaints in restricting her hours. It could also be

inferred that Defendants were restricting her hours to enforce her part-time status for budgetary

reasons and to enforce Morse's prior requests that Pettit spend all her time on admissions. The fact

that an inference is required to get from the e-mail to Morse's motive disqualifies it as direct

evidence.

## D.      Defendants' Legitimate Reasons for their Adverse Actions

Once plaintiff has established her prima facie case, the burden shifts to the employer to

"articulate some legitimate, nondiscriminatory reason for the employee's [discharge]." *McDonnell*

*Douglas*, 411 U.S. at 802.

> Establishment of the prima facie case in effect creates a presumption that the employer
> unlawfully discriminated against the employee . . . .

> The burden that shifts to the defendant, therefore, is to rebut the presumption of
> discrimination by producing evidence that the plaintiff was rejected, or someone else

---

[7] Pettit also points to four other examples of what she calls "the lead up" to this e-mail.
However, none are direct evidence.

> was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-255 (1981) (citations omitted). The employer's burden at this stage is one of production, not persuasion. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).

The adverse action established by Pettit is, at its core, a claim based on the contract required by Steppingstone. The gravamen of her argument is that she was required to sign a contract with terms so adverse and onerous that it effectively ended her employment, whether that end is defined as a termination or a constructive termination.

Defendants proffer a legitimate, non-retaliatory explanation for their insistence on the adverse provisions of Pettit's contract. First, Defendants argue that Pettit was stripped of her human resources duties because the school was in an enrollment crisis due to the relocation and needed her to focus on admissions, which would determine whether the school could survive in its new location. Morse also stated in her deposition that Pettit was not particularly skilled at human resources tasks. Second, Defendants assert that they limited Pettit's hours to twenty per week absent approval due to budget concerns related to the relocation. Third, Defendants contend that they prohibited Pettit from bartering for time in the extended day program because Pettit abused her ability to use the program free of charge by gradually working later and longer hours. Finally, to the extent Pettit's contract differed from those presented to other non-faculty employees, Defendants assert that they

based those changes on the advice of counsel and such clauses were necessitated by Pettit's position, responsibilities and behavior.

At this stage, Defendants have the burden of production. They have satisfied that burden by presenting legitimate business reasons that raise a genuine issue of fact as to whether they discriminated against Pettit.

**E.    Pretext**

At the final stage of the *McDonnell Douglas* inquiry, the burden of production requires the plaintiff to prove the employer's proffered reasons for its adverse actions against the employee were, in fact, pretext for retaliation. "To raise a genuine issue of fact as to pretext and defeat a summary judgment motion under this position, the Plaintiffs must show that (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate Defendants' action, or (3) the proffered reason was insufficient to motivate the action." *Adair*, 452 F.3d at 491 (citations omitted).

This Court recognizes the appropriateness of plaintiff's presentation of overlapping evidence in support of both the causal connection element of the prima facie case and the pretext stage of inquiry. While evidence of causal connection at the prima facie stage is often probative of pretext also, the plaintiff's burden at the prima facie stage is easily met. However, that evidence may be insufficient, standing alone, to raise a genuine issue as to pretext. *See, e.g.*, *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 533 (6th Cir. 2007) ("[T]he evidence that [the plaintiff] produce[s] in support of his prima facie case may, but will not necessarily, suffice to show a genuine issue of material fact concerning pretext and thus to survive summary judgment.") (overruled on other grounds).

Importantly, any requirement of additional evidence "is limited to the production of evidence rebutting the defendant's proffered legitimate, nondiscriminatory reason for taking the challenged action." *Id*. at 533 (discussing *Reeves*, 530 U.S. at 149).

In satisfying the prima facie, causal-connection requirement, Pettit presented evidence of both temporal proximity and disparate treatment in the terms of her contract. In support of her burden to show pretext, Pettit relies on this same evidence with additional responses to Defendants' claimed legitimate reasons for their actions. The district court granted summary judgment to Defendants on the basis that Pettit had not proven pretext. Its decision was based, in part, on an adverse credibility determination - that Pettit's behavior cast doubt on her credibility. It is not proper to weigh credibility against the non-movant on a motion for summary judgment. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) ("In reviewing a summary judgment motion, credibility judgments and weighing the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party." (citing *Anderson*, 477 U.S. at 255)).

However, this Court may affirm a trial court decision on alternative grounds that support the decision on the record. *Murphy v. Nat'l City Bank*, 560 F.3d 530, 535 (6th Cir. 2009). We find that the record, as well as the district court's rationale not based on Pettit's credibility, support affirmance. Pettit has not rebutted Defendants' proffered, legitimate reasons for their actions. Pettit never specifies which of the three pretext factors applies to her situation, but it appears she seeks to show that the "proffered reason[s] did not actually motivate Defendants' action." To do so, Pettit must present some evidence rebutting each of those proffered reasons. Temporal proximity is

insufficient to carry this burden. An examination of Plaintiff's pretext evidence shows it to be insufficient as well.

*The removal of Pettit's human resources duties.* As a legitimate reason for this action, Defendants proffered that Pettit's attention was needed in admissions due to the school's relocation crisis and the fact that she was not particularly skilled in the area of human resources. To show that these reasons are pretextual, Pettit states that she was available to work more hours to complete both the admissions and human resources duties. But that does not tend to rebut Defendants' rationale nor address the stated concerns. Pettit fails to dispute the real issues: that Steppingstone was facing an enrollment crisis that threatened the existence of the school; that based on the school budget and this crisis, she had been requested since January to concentrate all her efforts on admissions; that she was asked to "agree to disagree" on the human resources issue until after the crisis; and, that Pettit refused to do so. Further, Pettit makes no attempt to show that she was, in fact, skilled in human resources. Thus, we are left with the conclusion that Pettit failed to show Defendants' legitimate reason for the removal of her human resources duties was pretext.

*No bartering for extended day care.* As legitimate reasons for this action, Defendants proffered that: Pettit abused her limited ability to use the program without charge; because she was supposed to be part-time, it was never intended that she could use the program extensively; and, another employee who overused the program was also charged. To show pretext, Pettit states that she was never asked to reduce her use of the program. While this may raise a question, it is insufficient to create a genuine issue as to pretext. Defendants showed that Pettit was not actually

charged for much of her use of the program in March, April, and May 2008, and that another employee was charged for excess use of the program in the same way Pettit was. Further, because Pettit was hired as a part-time employee limited to a set schedule during school hours, Defendants' explanation that it never intended for Pettit to use the day care program extensively is certainly legitimate. Defendants' failure to request that Pettit reduce her use of the program is not sufficient to rebut the evidence and reasoning proffered by Defendants, and thus no genuine issue of fact exists as to this term.

*Termination* and *Insistence that Pettit sign the new, adverse employment contract*. As discussed earlier, Defendants allege Pettit was not terminated but was no longer employed because she failed to sign her employment contract, which was required of all employees for continued employment. Pettit alleges termination and, to show pretext, states that Morse lied to other employees about the termination, saying that Pettit had quit to devote more time to her sons and to scrapbooking. We view this issue as akin to constructive discharge. Thus, the adverse action that resulted in Pettit's loss of employment is more appropriately addressed under Steppingstone's insistence on an employment contract with new and adverse terms. To show pretext regarding that action, Pettit argues she was the only employee required to sign a contract so favorable to Steppingstone's interests. Pettit is correct that disparate treatment is probative of retaliatory intent. *See, e.g.*, *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 524 (6th Cir. 1997); *Reynolds v. Humko Prod.*, 756 F.2d 469, 472-73 (6th Cir. 1985). However, Pettit has failed to show that she is similarly situated to the employees whose contracts were different. We do not require an exact match in a

comparator, but our comparison must nonetheless take into account Pettit's burden to rebut the legitimacy of Defendants' proffered reasons.

As the nondiscriminatory basis for the differences between Pettit's contract and that of other Steppingstone employees, Defendants note that the school crisis, Pettit's unique position as Director of Admissions and her actions are legitimate reasons for making the changes to Pettit's contract upon the advice of counsel. In regard to the charge that Pettit's contract was different from those of other employees and from her own prior contract, it is also important to note that: Pettit's original contract was merely a form; it included language negotiated by Pettit that differed from the contracts signed by other employees; Defendants had the form contract revised in the summer of 2007 to better safeguard the school's interests,[8] and that revised contract was presented to, and signed by, all other Steppingstone employees.

Though all employment contracts were changed in Steppingstone's favor in 2007, it is true that Pettit's contract also differed in its terms from those of other employees. While this is not an easy case, the record supports a finding that Pettit's behavior, bordering on insubordination, was a reasonable basis for inserting into her contract certain terms drafted by counsel to safeguard Steppingstone's interests. Pettit's position, contract negotiations and her actions make her dissimilar from the other employees. No other employee had retained legal counsel to negotiate the particulars of an employment contract that had and would contain provisions different from those of other

---

[8] For example, the revised contract included a liquidated damages clause for breach by the employee.

employees. More telling is the lack of similarity based on Pettit's actions. No other employee had attacked Morse's character and abilities or aired grievances in lengthy series of e-mails that copied and sought to engage the Board of Trustees. Perhaps most importantly, no other employee was ignoring Morse's instructions calculated to guide the school through the enrollment crisis created by the forced location change. Pettit was the Director of Admissions. Morse anticipated lower enrollment and extra expenses for the school in the upcoming year and thereafter. It was not illegitimate for Defendants to seek to obtain contractually that which they had been requesting for some time: Pettit's sole focus on admissions and cessation of expending school resources and time outside that needed focus. Pettit has not presented evidence showing these actions were pretext for retaliation. Therefore, even assuming Pettit has proven disparate treatment, as we did at the prima facie stage, she has failed to rebut Defendants' legitimate reasons for changing the terms of her contract.

## III.    Conclusion

Defendants proffered legitimate reasons for their actions as to Pettit. Pettit has failed to identify evidence from which a reasonable jury could conclude that the legitimate reasons given by the Defendants were actually a pretext for unlawful discrimination. She has failed to present probative evidence indicating the necessity of a trial for resolving a material factual dispute. Therefore, the district court's grant of summary judgment to the Defendants is AFFIRMED.