**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0270n.06

No. 19-3699

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 14, 2020
DEBORAH S. HUNT, Clerk

ALISON McKINNON,

    Plaintiff-Appellant,

v.

L-3 COMMUNICATIONS CORP.;
L-3 COMMUNICATIONS
CINCINNATI ELECTRONICS
CORP.,

    Defendants-Appellees.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

BEFORE:     CLAY, ROGERS, and GRIFFIN, Circuit Judges.

**CLAY, Circuit Judge.** Plaintiff Alison McKinnon claims that her employer, L-3 Communications Corporation ("L-3"), retaliated against her for asserting her colleagues' right to be treated as non-exempt employees under the Fair Labor Standards Act ("FLSA"), in violation of 29 U.S.C. § 215(a)(3), and for making a complaint of gender discrimination, in violation of Ohio Revised Code § 4112. The district court granted summary judgment to Defendants on both claims and subsequently denied McKinnon's motion to reconsider. McKinnon now appeals. For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment on McKinnon's FLSA retaliation claim and its denial of her motion to reconsider that claim, **REVERSE** its judgment as to her Ohio state law retaliation claim, and **REMAND** for proceedings consistent with this opinion.

**BACKGROUND**

In February 2012, L-3 hired McKinnon as the Senior Director of Human Resources ("HR") for its Cincinnati Electronics ("CE") division. As Senior Director of HR, McKinnon was responsible for leading HR functions, ensuring compliance with employment law and policies, providing guidance to L-3's leadership, and facilitating personnel development. In this role, McKinnon reported to Russ Walker, the President of CE.

Walker also administered McKinnon's performance reviews. Many of those reviews suggested that she was a valued member of the CE team. (*See, e.g.*, McKinnon Dep. Ex. 6, R. 22-1 at PageID #298 (noting in 2013 review that McKinnon was "one of [Walker's] most important assets in the [Senior Leadership Team]"); McKinnon Dep. Ex. 8, R. 22-1 at PageID ##312–13 (stating in 2014 review that McKinnon was "an invaluable resource" and giving her an overall performance rating between "meets expectations" and "exceeds expectations").) In October 2015, Walker rated McKinnon's overall leadership as more effective than five of his male subordinates.

Nevertheless, McKinnon's record at L-3 was blemished. In 2013, L-3 twice investigated McKinnon's conduct after receiving employee complaints about her allegedly aggressive management style. After concluding these investigations, L-3 found that both complaints were unsubstantiated. McKinnon's performance reviews also included critical comments. (*See, e.g.*, McKinnon Dep. Ex. 5, R. 22-1 at PageID #288 (acknowledging issues with relationship building in 2012 review); McKinnon Dep. Ex. 6, R. 22-1 at PageID #298 (noting in 2013 review that "an area for development" for McKinnon was in "tempering her response to frustrating situations"); McKinnon Dep. Ex. 8, R. 22-1 at PageID #312 (stating in 2014 review that McKinnon sometimes failed to listen and sometimes provided input in a "too harsh and critical" or "disrespectful and

confrontational" manner).) Accordingly, in April 2014, McKinnon began working with an executive coach to improve her relationships and communications with her colleagues.

Despite these issues, McKinnon continued her work without major event until mid-2014. At that point, the Vice President ("VP") of HR, Andrea Krych Connolly, launched an effort to ensure that L-3's employees were properly categorized as "exempt" or "non-exempt" from the FLSA's minimum-wage and maximum-hour requirements. *See* 29 U.S.C. § 213. McKinnon was brought onto this project, and together the project team identified a small group of misclassified employees who were entitled to back pay for overtime. One of those employees was Kim Neil, who served as an assistant to another employee, Lou Park. Park was the Chief Financial Officer ("CFO") and Executive VP of the Integrated Sensing Systems ("ISS") sector, a section of L-3 of which CE was a part, and also had HR responsibilities. Upon hearing that Neil should be reclassified from exempt to non-exempt, Park was resistant. In June 2014, Park emailed Connolly about a conversation they had concerning Neil, saying he thought he and Connolly had "agreed that [Neil's] position, while ambiguous, should remain an exempt position." (Connolly Dep. Ex. 1, R. 32-1 at PageID #1538.) When Connolly said she would have the issue reviewed by the legal team, Park responded, "That works as long as Kim stays exempt." (*Id.* at #1537.)

Around the same time, Connolly filed an internal complaint regarding the allegedly sexist behavior of another employee toward Connolly and members of her team. Connolly reported that other women who had been victimized by this employee feared retaliation and even termination if they reported that treatment. She also said that she herself had been retaliated against after confronting the employee about his behavior. L-3 undertook an investigation of that employee and ultimately concluded that he mistreated male and female employees equally. The day after that

investigation ended, L-3 notified Connolly that her position was being eliminated, and she subsequently left the company.

The FLSA exemption project continued on following Connolly's departure, now under the leadership of another HR VP, Jim Worsham. However, L-3's progress on the project stalled. After some delay, McKinnon brought up the project on a phone call with other HR employees and several senior executives in December 2014. Specifically, the call included Jeff Miller, who was ISS President; Park, who was VP and CFO of ISS; Robyn Turchyn, who was a VP of HR for another ISS division; and other HR representatives. McKinnon explained that some employees had been misclassified as exempt and that they must be paid for their past overtime before the end of the year. In her later deposition, McKinnon said that she told the group on the call that "'We need to complete these [reclassifications] . . . [for] at least my two individuals I'm responsible for,'" and noted that the others "weren't [her] responsibility" because they "were in a different division." (McKinnon Dep., R. 22 at PageID #133.)

Miller was frustrated by this news, and he and McKinnon argued. Miller said that leadership had not known about the exemption project and expressed anger that McKinnon was bringing up a $500,000 liability so late in the year. McKinnon emailed Miller afterwards to explain that others had known about the project, including Park, and that Park had tried to obstruct the project. Forwarding the emails between Park and Connolly, McKinnon explained that the legal team had approved the reclassifications months earlier. She noted that a new HR employee had been hired for the division, but that "I thought that since this [reclassification] project was nearly over the goal line, I would just wrap it up, (I had HR responsibility for [the division] at the time)." (Pombeiro Dep. Ex. 55, R. 24-1 at PageID #1029.) McKinnon told Miller that the new HR employee felt she had been "threatened" and "bullied" to ensure that Kim Neil was not reclassified,

and that McKinnon had reassured her that "since I had initiated the project, that I would see it through, and take any heat that came down from it." (*Id.*) Finally, McKinnon explained that Neil's role did not "meet the Exemption threshold" and that the company was obligated to pay her "4 years of backpay . . . in overtime which is around $45K." (*Id.*)

In his reply, Miller noted first that any employee reports about threatening or bullying "need[ed] to be reported and investigated as an ethics issue." (*Id.* at #1028.) He went on to dismiss Park's alleged obstruction as unevidenced and suggest that others were concerned about the reclassifications simply because the potential costs had not been included in L-3's financial forecast. McKinnon replied,

> At this point, we are negligent by not acting on reclassifying the positions that are known to be misclassified. If there are still some that are in dispute, we can wait until we get agreement on those, but legal issued an opinion in August on these and I am concerned that we haven't done anything about it and that is why I raised the issue.

(*Id.* at #1027.) McKinnon later explained in her deposition that she "felt as though [she] had a legal liability" to ensure that these positions were reclassified, as the legal department had "signed off on these positions . . . be[ing] classified as nonexempt, and issued a[n] opinion about backpay and gave us the marching orders to go implement" months earlier, "and it wasn't getting implemented." (McKinnon Dep., R. 22 at PageID #132.)

In February 2015, McKinnon brought the exemption issue up again in a meeting with Miller, about which she later emailed Walker: "I explained to him that the reason we were having this meeting at all is because I don't do jail and this overtime issue had been going on too long and we were out of compliance. They agreed to change Christine Disadoro and Kim Neil effectively immediately since those are no longer in dispute." (McKinnon Dep. Ex. 22, R. 22-3 at PageID

#369.) She also told Walker that Miller had "personally attacked [her]" before the meeting and then questioned and undermined her team's analyses during the meeting. (*Id.*)

Defendants suggest that McKinnon's conflicts with Miller were prompted by her poor communication and contend that McKinnon had similar problems with other employees. (*See, e.g.*, Wasnock Dep., R. 25 at PageID ##1166–67 (employee states that when he asked McKinnon for help, she lectured him in an "unnecessarily adversarial" tone in a manner that was "atypical of my interaction with other HR ethics people within L-3."); McKinnon Dep. Ex. 17, R. 22-2 at PageID ##350–51 (McKinnon's executive coach writes in an August 2014 report that McKinnon "continues to have challenges with leading her team, although I believe this is improving" and that she should "continue to work on her peer relationships.").) McKinnon, for her part, asserts that in late 2014, Miller, Park, and Turchyn—all of whom were on the December 2014 call in which she brought up the misclassification issue—began to single her out for mistreatment. (McKinnon Dep., R. 22 at PageID ##147–48, 173–76 (noting that she was criticized on public phone calls, subjected to additional scrutiny, rejected for project leadership roles, denied one-on-one meetings with Walker, excluded from meetings, given a smaller bonus, and ultimately told that she would be fired); McKinnon Dep. Ex. 48, R. 22-5 at PageID ##443–45.)

One incident is particularly significant. In a draft email to Worsham that McKinnon shared with her executive coach in May 2015, McKinnon reports that one of her team members told McKinnon that their colleague Robyn Turchyn had "question[ed] her about how she liked working for [McKinnon]. When she had . . . positive things to say . . . [including] that [McKinnon] was a good mentor, he replied that it must be difficult working for someone who has had so many ethics complaints filed against [her]." (McKinnon Dep. Ex. 24, R. 22-3 at PageID #372.) McKinnon went on to note that she thought Turchyn might have filed a false ethics complaint against her.

McKinnon ended up working with her coach to write out a statement about the issue that she then made to new HR VP Worsham by phone on May 27, 2015.

McKinnon asserts that she expressly mentioned gender discrimination on that May 27, 2015 phone call with Worsham. The written document McKinnon and her coach put together does not mention gender or sex, (*see* McKinnon Dep. Ex. 25, R. 22-3 at PageID ##373–76), but McKinnon explained in her deposition that the document was "not complete," and instead reflected only "how I started out the conversation," (McKinnon Dep., R. 22 at PageID ##162–63). Walker stated in his deposition that he talked with McKinnon, Worsham, and Park about this call and that he ultimately sent Worsham the team member's statement that McKinnon had discussed on the call.

On July 12, 2015, McKinnon emailed Worsham "to follow up on our discussion of May 27," because she "ha[d] not heard back from [him]" on the matter. (McKinnon Dep. Ex. 30, R. 22-3 at PageID #387.) She indicated that she was providing a "summary" of the May phone call and, after discussing several matters from her previous statement, concluded, "The bottom line is that I am being harassed, bullied, and I believe that it is based on my gender. I am formally requesting that these complaints be investigated by an HR leader outside of the ISS Sector." (*Id.* at ##387–88.) In a later affidavit and deposition, McKinnon did not explicitly mention sex or gender when discussing the May phone call, but stated simply that she had complained of "harassment." (McKinnon Aff., R. 36-2 at PageID #1674.)

L-3 claims on appeal that it decided to terminate McKinnon before she sent this email regarding the May call. Walker said in his deposition that the decision to terminate McKinnon was made in July 2015, but his accounts of that decision conflict. At first, he suggested that he, Park, Miller, and Worsham discussed terminating McKinnon around the middle of 2015, and that at

some point he was told to give McKinnon a severance package in July. (Walker Dep., R. 23 at PageID ##520–21.) Later, Walker testified that he decided to fire McKinnon by himself and that "nobody told [him] to fire [McKinnon] or suggested that [he] should fire her before [he] made that decision." (*Id.* at #609.) In L-3's answers to interrogatories, it stated that Park, Miller, Walker, Worsham, and another employee named Stephen Wahl played a role in the decision to terminate McKinnon.

In any case, on July 10, 2015, McKinnon and Walker had a conversation, which McKinnon summarized as follows:

> [Walker] suggested that I look for another job, and that he felt that I had time in that L-3 never acted quickly with anything, but that someone had poisoned the well. We speculated whether it could have been Lou [Park] or Larry Wasnock but neither of us were certain where it had come from. He said that when I got another job, he would get me a really good severance package.

(McKinnon Dep. Ex. 11, R. 22-2 at PageID #333; *see also* McKinnon Dep., R. 22 at PageID #171.)

Two days later, on July 12, 2015, McKinnon sent her follow-up email to Worsham, explicitly alleging gender discrimination. L-3 initiated an investigation of her complaint, which concluded in October 2015. That investigation yielded no evidence of gender discrimination and concluded that McKinnon was being treated as she was because other employees perceived her to be "brusk," "combative," "negative," and "difficult." (Pombeiro Dep. Ex. 57, R. 24-1 at PageID #1091.) Also in October 2015, McKinnon filed another complaint, alleging that Miller had directly retaliated against her for filing her gender discrimination complaint by questioning and criticizing her on a conference call. In November 2015, McKinnon filed a third ethics complaint in which she alleged that both Park and Miller had retaliated against her for "carrying out a project . . . to change the FLSA status of several employees within the ISS Sector" and "attempt[ing to] implement[] the legal . . . approved designations for these employees." (McKinnon Dep. Ex. 39, R. 22-4 at PageID

#407.) L-3 employees testified that, even if it wanted to, the company could not actually terminate McKinnon between July 2015 and January 2016 because it was company policy that an employee could not be terminated while she was involved in an ongoing ethics investigation.

On January 20, 2016, Worsham and Walker called McKinnon in for a meeting. They told her that the investigations to date had not substantiated her complaints and that her employment was being terminated that day. They offered her a severance package including three months' pay, outplacement services, COBRA benefits, and a bonus McKinnon later described as "inadequate." (McKinnon Dep., R. 22 at PageID ##210–11.) She declined the package. McKinnon's employment was ultimately terminated on February 23, 2016, allegedly without an offer of a severance package.

In April 2016, McKinnon filed suit against L-3, asserting, among other claims: gender discrimination, in violation of Ohio Revised Code § 4112; retaliation for complaining of gender discrimination, in violation of Ohio Revised Code § 4112; and retaliation in violation of the FLSA, 29 U.S.C. § 215(a)(3). In August 2018, the district court granted summary judgment to Defendants on all but McKinnon's gender discrimination claim. *See McKinnon v. L-3 Commc'ns Corp.*, No. 1:16-CV-00458-MRB, 2018 WL 3863406 (S.D. Ohio Aug. 14, 2018). That claim proceeded to and through a jury trial. Before the jury rendered its verdict, McKinnon filed a motion for reconsideration and reinstatement of her retaliation claims pursuant to Federal Rule of Civil Procedure 54(b). In that motion, McKinnon argued that new evidence and testimony that had come out at trial was pertinent to these already decided claims. The district court denied this motion, stating simply that McKinnon could use the evidence pointed to in her motion to argue her gender discrimination claim then before the jury, but that it would not reopen the retaliation claims. In June 2019, the jury rendered a verdict for L-3. McKinnon then filed this timely appeal.

**DISCUSSION**

**I.    Retaliation Claims**

This Court reviews a district court's grant of summary judgment *de novo*. *Cacevic v. City of Hazel Park*, 226 F.3d 483, 491 (6th Cir. 2000). Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . . The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

McKinnon urges this Court to consider evidence presented at trial in reviewing the district court's grant of summary judgment. But on appeal, we may consider only the record before the district court at the time of L-3's motion for summary judgment. *See, e.g.*, *Cacevic*, 226 F.3d at 491 (collecting cases). Thus, we will address McKinnon's new evidence only where it is properly considered—in our review of the district court's denial of her motion to reconsider.

**A.  FLSA Retaliation**

McKinnon first argues that L-3 retaliated against her for asserting FLSA rights, in violation of 29 U.S.C. § 215(a)(3). Under that law, an employer may not "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the FLSA. *Id.* This Court considers FLSA retaliation claims under the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). Under that framework, a plaintiff must first demonstrate a *prima facie* case of retaliation

by showing that: (1) "she engaged in a protected activity under the FLSA"; (2) "her exercise of this right was known by the employer"; (3) "thereafter, the employer took an employment action adverse to her"; and (4) "there was a causal connection between the protected activity and the adverse employment action." *Id.* If the plaintiff can make such a showing, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant provides such a reason, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Id.*

A district court may rightly grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). L-3 does not contest that it was aware of McKinnon's reclassification efforts or that it took an adverse employment action against her. The parties dispute only whether McKinnon has shown the first and fourth elements of her *prima facie* case—protected activity and causation. McKinnon argues that she engaged in protected activity under the FLSA when she argued for overtime pay for Kim Neil, and that this activity caused her termination.[1] The district court found that there was no genuine dispute of material fact as to either element. *McKinnon*, 2018 WL 3863406, at \*11. We agree that there is no remaining genuine issue of material fact as to whether McKinnon's activity was protected under the FLSA, and so we affirm the district court's grant of summary judgment.

---

[1] Before the district court, McKinnon also argued that she engaged in protected activity when she filed an internal complaint alleging FLSA retaliation in fall 2015. The district court assumed that her complaint was protected activity, but found that McKinnon could not show that it caused her termination, which was purportedly contemplated well before she filed the complaint. *McKinnon*, 2018 WL 3863406, at \*11. On appeal, McKinnon does not contest the district court's grant of summary judgment as to this activity, and so it is not preserved for our review.

An employee engages in protected activity when she "file[s] any complaint or institute[s] or cause[s] to be instituted any proceeding under or related to" the FLSA. 29 U.S.C. § 215(a)(3). A complaint has been "filed" when a reasonable, objective person would understand the employee to have put the employer on notice that she is asserting statutory rights under the FLSA. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). A complaint must be made with "some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." *Id.*

We are especially attentive to the contours of protected activity when an employee has been "specifically tasked with personnel or human resources duties." *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 530 (6th Cir. 2011). For such an employee, "dealing with FLSA compliance is part of the job, to be undertaken with the interests of the employing company in mind." *Id.* In recognition of this fact, courts generally require that an employee with these duties somehow "'step outside the role' or otherwise make clear to the employer that [she] was taking a position adverse to the employer" in order for the employee's activity to be protected under 29 U.S.C. § 215(a)(3). *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 628 (5th Cir. 2008); *see also Pettit*, 429 F. App'x at 530. Otherwise, "nearly every activity in the normal course of [such an employee's] job would potentially be protected activity under Section 215(a)(3)," making it "difficult to discharge [her] without fear of a lawsuit." *Hagan*, 529 F.3d at 628. Thus, "[t]o the degree that [McKinnon's] FLSA complaints were made in the course of performance of human resource job duties assigned to her and undertaken for the purpose of protecting the interests of the employer, they do not constitute protected activity under § 215(a)(3)." *Pettit*, 429 F. App'x at 530.

The record makes clear that McKinnon did not move beyond performance of her job duties in her efforts to have her colleagues reclassified. As Senior Director of HR, McKinnon was responsible for ensuring compliance with employment law and policies. As part of these responsibilities, she was tasked with determining whether employees in her division were properly classified under the FLSA. (*See* Connolly Dep., R. 32 at PageID #1491 (explaining that "[t]he HR professionals that worked under me that were responsible for those areas had . . . to further look at those positions" and assess whether they were exempt or non-exempt); *id.* at #1492 (noting that "all of the HR leads within the sector were aware of and participating locally in that assessment process that was their responsibility").) McKinnon apparently took care to stay within the confines of these duties. For instance, on the December 2014 call, she asserted only that "at least [the] two individuals [she was] responsible for" needed to be reclassified. (McKinnon Dep., R. 22 at PageID #133.) Because "[t]he others were in a different division," McKinnon later explained, "[t]hey weren't [her] responsibility." (*Id.*) After the call, in her email to Miller, she explained that she continued working on the reclassification project because she "had HR responsibility for [the relevant division] at the time." (Pombeiro Dep. Ex. 55, R. 24-1 at PageID #1029.)

Nor did McKinnon undertake any efforts "adverse to [L-3's] interests." *See Pettit*, 429 F. App'x at 531. It is true that, like some assertions of FLSA rights, McKinnon's efforts were "specific to one or more employee(s)" and were in those employees' interest. *Id.* at 530–31. But she undertook those efforts at L-3's bidding and they were also apparently in its interest. McKinnon explained in her deposition that she was simply following the legal department's "marching orders" in trying to have her colleagues reclassified. (McKinnon Dep., R. 22 at PageID #132.) Indeed, throughout the course of her efforts, she repeatedly clarified that L-3's legal department had approved the reclassifications that she advocated. (Pombeiro Dep. Ex. 55, R. 24-1

at PageID ##1027, 1029; McKinnon Dep. Ex. 39, R. 22-4 at PageID #407 (noting in her November 2014 complaint that she was retaliated against for "carrying out a project . . . to change the FLSA status of several employees within the ISS Sector" and "attempt[ing to] implement[] the legal . . . approved designations for these employees").) Moreover, when she got push-back from her superiors, she conceded that L-3 could hold off on reclassifying employees whose status was in dispute "until we get agreement on those." (Pombeiro Dep. Ex. 55, R. 24-1 at PageID #1027.) Thus, McKinnon herself understood that she was doing precisely what L-3 had asked of her and advocating only for changes it approved. Identifying colleagues who had been misclassified and were due backpay, in this situation, was "not only *not adverse* to the company's interests, it [was] exactly what the company *expect[ed]* of [McKinnon]." *Hagan*, 529 F.3d at 628.

McKinnon analogizes her efforts to those of the plaintiff in *Pettit v. Steppingstone, Center for the Potentially Gifted*. In that case, we concluded that a human resources professional's evidence that she engaged in protected activity under the FLSA sufficed to withstand her employer's motion for summary judgment. 429 F. App'x at 530–31. We reasoned that the plaintiff had "clearly stepp[ed] outside her official capacity" first by threatening to report her employer's failure to comply with the FLSA to the Department of Labor and second by "assert[ing] a violation of her own FLSA rights, namely [her employer's] failure to pay her approximately $1,000 in overtime pay," and "impl[ying] she could institute legal action, an act clearly in her own interest and, thus, outside her job duties." *Id.* at 527, 531. But in contrast to the plaintiff in *Pettit*, McKinnon noted L-3's potential legal liability only to aid it in avoiding that liability. (Pombeiro Dep. Ex. 55, R. 24-1 at PageID #1027; McKinnon Dep. Ex. 22, R. 22-3 at PageID #369); *see McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996) (finding the plaintiff had not engaged in protected activity where, "in her capacity as personnel manager, she informed the company that it

was at risk of claims that might be instituted by others as a result of its alleged FLSA violations"). McKinnon expressed no interest in taking action against L-3 herself; nor did she attempt to assist Neil or other misclassified employees in asserting their own rights. *See McKenzie*, 94 F.3d at 1486–87 (noting that an employee could assert FLSA rights by "fil[ing] (or threaten[ing] to file) an action adverse to the employer" or "actively assist[ing] other employees in asserting FLSA rights").

Because McKinnon advocated for her colleagues' reclassification only "in the course of performance of human resource job duties assigned to her and undertaken for the purpose of protecting the interests of the employer," those efforts do not constitute protected activity under § 215(a)(3). *Pettit*, 429 F. App'x at 530. Absent a sufficient showing on this element, McKinnon's FLSA retaliation claim cannot succeed. *See Celotex Corp.*, 477 U.S. at 322. Thus, we need not consider whether McKinnon has shown that this activity caused her termination. We now proceed to her remaining claim.

## B. Retaliation for Reporting Gender Discrimination

McKinnon next alleges that L-3 retaliated against her for reporting gender discrimination, in violation of Ohio Revised Code § 4112.02(I). Under that law, employers may not "discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under" Ohio's discriminatory practices provisions. *Id.* "This language mirrors that of Title VII, which establishes civil penalties under federal law for any employer that 'discriminate[s] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter.'" *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (alterations in original) (quoting 42 U.S.C. § 2000e–3(a)). Accordingly, the Ohio Supreme Court

has held that "federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of [Ohio Revised Code] Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).

This Ohio law claim is also subject to the *McDonnell Douglas* burden-shifting framework, and the elements of a *prima facie* case mirror those of other retaliation cases. *Braun*, 828 F.3d at 510. Thus, a plaintiff must show that she engaged in protected activity, the defendant knew about that activity, the defendant took an adverse employment action against her, and that action was caused by her protected activity. *Id.* Once she has done so, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 511. Upon such a showing, the burden shifts back to the plaintiff to demonstrate that the defendant's asserted reason is merely pretextual. *Id.*

The district court concluded that McKinnon had not raised a genuine issue of material fact as to causation because the evidence purportedly showed that L-3 had contemplated terminating McKinnon before she reported gender discrimination. *McKinnon*, 2018 WL 3863406, at \*10. It did not reach the other elements of her claim. L-3 does not dispute any of the other elements of her *prima facie* case, but argues in the alternative that this Court should affirm because McKinnon failed to show that L-3's proffered reason for terminating her was pretextual. For the reasons set forth below, we conclude that genuine issues of material fact remain as to both causation and pretext, and so the district court erred in granting summary judgment to Defendants on this claim.

### 1. Causation

In order to demonstrate sufficient causation under Title VII, a plaintiff must show "but for" causation, or "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338,

360 (2013). McKinnon can carry her burden of showing causation by presenting "evidence that defendant treated [her] differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

However, evidence that an employer "proceed[ed] along lines previously contemplated, though not yet definitively determined," in taking its adverse employment action "is no evidence whatever of causality." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam)). This is because "employees who see the proverbial writing on the wall that they are about to be fired should not be able to use Title VII protections to insulate themselves from adverse employment actions that were previously contemplated." *Id.* But the fact that an employer had previously contemplated terminating an employee does not make it "open season" for it to violate the employee's legal protections. *Id.* Thus, "where an employer deviates from th[e] lines [previously contemplated], temporal proximity can certainly be evidence of causality." *Id.* We "must analyze the evidence of how and when the adverse employment action occurred to determine whether it squares with the action previously contemplated." *Id.* If the adverse employment action "is unlike the action previously contemplated or does not occur on the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation." *Id.*

Drawing all inferences in McKinnon's favor, a reasonable jury could conclude that McKinnon reported gender discrimination on her May 27, 2015 phone call with Worsham, which was prior to the date L-3 purportedly began contemplating her termination. McKinnon's July 12, 2015 email states that it is a summary of her conversation with Worsham in May. (McKinnon Dep.

Ex. 30, R. 22-3 at PageID #387.) She goes on to say that "[t]he bottom line" of her allegations "is that I am being harassed, bullied, and I believe that it is based on my gender." (*Id.* at #388.) Although McKinnon's written plan for the May call does not specifically mention gender or sex, her subsequent deposition testimony clarified that the document did not reflect the whole of what was discussed on the call. (McKinnon Dep., R. 22 at PageID ##162–63 (explaining that the document was "not complete," but "at least how I started out the conversation"); *id.* at #165 (stating that she concluded the call with "roughly" what was included in the planning document).) Furthermore, while McKinnon did not clarify that, on that call, she complained of gender harassment specifically—rather than simply general harassment—in either her deposition or her affidavit, she has never stated that she meant only general harassment, and so her statements are not contradictory. Making all justifiable inferences in McKinnon's favor, this evidence suffices to raise a genuine issue of material fact as to whether she indeed made a gender discrimination complaint before she learned of her potential termination on July 10, 2015.

Defendants argue that McKinnon has also failed to show causation because Walker alone decided to terminate her and he did not know about her May complaint. But this conclusion requires inappropriate inferences in L-3's favor. While Walker testified that he made the decision alone, this testimony conflicted with other portions of his testimony and with L-3's answers to interrogatories. Those answers indicate that Worsham and several others had a part in the decision to terminate McKinnon. If McKinnon did report gender discrimination on her May call, as at this juncture we must assume, that complaint could thus have caused Worsham to decide to terminate her. Moreover, Walker's own testimony suggests he at a minimum knew that McKinnon had made a harassment complaint on her call with Worsham, because he talked with McKinnon, Worsham, and Park about the call and because he sent to Worsham McKinnon's team member's statement

about Turchyn's conduct. (Walker Dep., R. 23 at PageID ##621, 631.) It is true that Walker also stated that he did not think McKinnon complained of gender discrimination. (*Id.* at #622.) However, this statement is not conclusive. Making all inferences in McKinnon's favor, it is reasonable to infer that if McKinnon had mentioned gender discrimination on the call, she would also have mentioned it to Walker in summarizing that call.

Finally, even assuming McKinnon did not complain of gender-based harassment prior to her July 12, 2015 email, there is a genuine issue of material fact as to whether L-3 deviated from its previously contemplated course of action when it ultimately terminated McKinnon. When deposed, McKinnon explained that in her July 10, 2015 conversation with Walker, he said that she had time to find another job before her termination. (McKinnon Dep., R. 22 at PageID #171; *see also* McKinnon Dep. Ex. 11, R. 22-2 at PageID #333.) Record evidence suggests that L-3 ultimately terminated McKinnon before she had secured another job. This raises a genuine issue of fact as to whether her termination occurred in a manner "unlike the action previously contemplated" and not according to "the schedule previously laid out." *Montell*, 757 F.3d at 507.

Thus, there remains a genuine dispute of material fact as to causation. Because L-3 does not contest whether McKinnon demonstrated a genuine issue of material fact as to the other elements of her *prima facie* case and McKinnon does not contest whether L-3 has put forward a facially neutral reason for her termination, we proceed directly to consider pretext.

### 2. Pretext

After finding that McKinnon failed to demonstrate a *prima facie* case of retaliation under Ohio law, the district court did not reach the question of whether she had sufficiently demonstrated that L-3's asserted reason for terminating her was pretextual. Because we "can affirm a decision of the district court on any grounds supported by the record, even if different from those relied on

by the district court," we think it appropriate to consider this question. *See Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (per curiam). Our review confirms that there are lingering genuine disputes of material fact as to whether L-3's purported reasons for terminating McKinnon were pretextual.

"To raise a genuine issue of fact as to pretext," McKinnon must demonstrate that "(1) the proffered reason [for her termination] had no factual basis, (2) the proffered reason did not actually motivate Defendants' action, or (3) the proffered reason was insufficient to motivate the action." *Adair*, 452 F.3d at 491. Ultimately, the Court's inquiry is simply this: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

When considering pretext with respect to McKinnon's separate gender discrimination claim, the district court concluded that there was a genuine issue of material fact because "at least one similarly situated male [(Kevin Haurin)] was not fired, despite significant problems with communication and peer relationships." *McKinnon*, 2018 WL 3863406, at *8. The same evidence suffices to show a genuine issue of material fact as to pretext on McKinnon's claim of retaliation for reporting gender discrimination. Haurin, like McKinnon, was a director who reported to Walker. *Id.* (citing Walker Dep., R. 23 at PageID #534). Both McKinnon and Haurin were required to manage a staff and to demonstrate communication, leadership, and relationship-building skills. *Id.* (citing Walker Dep., R. 23 at PageID ##534–35). Both had issues with communication, interpersonal skills, and team management. *Id.* (citing McKinnon Dep. Ex. 6, R. 22-1 at PageID #298; Walker Dep., R. 23 at PageID #535; Neff Aff. Ex. A, R. 36-1 at PageID #1653). Both were assigned the same executive coach to work on those skills. *Id.* (citing Walker Dep., R. 23 at PageID ##535–36). Despite those efforts, Haurin "backslid" in performance. *Id.* (citing Walker Dep., R.

23 at PageID #535). In an October 2015 review, Walker rated McKinnon higher than Haurin in leadership effectiveness, core values, results, and performance. Plaintiff was terminated, and Haurin was not. *Id.* Because the same issues did not apparently motivate L-3 to terminate Haurin, there is a genuine issue of fact as to whether that "proffered reason . . . actually motivate[d]" or was sufficient to motivate L-3's action. *Adair*, 452 F.3d at 491.

L-3 responds that Haurin's job duties were not "sufficiently similar to [McKinnon's] such that they could be considered a legal comparator." (Defs. Br. at 35.) But as the district court pointed out, "Walker concede[d] that [McKinnon] was not terminated for any HR-specific technical deficiency (e.g., collective bargaining, personnel development, etc.)." *McKinnon*, 2018 WL 3863406, at *8 (citing Walker Dep., R. 23 at PageID #498). McKinnon was only required to show that Haurin was similar to her in "all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998); *see also, e.g.*, *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005). McKinnon was allegedly terminated for poor leadership and communication skills. She has shown that Haurin, like her, was in a position of leadership that required him to manage a team and that he, too, had problems with leadership and communication. While a more detailed job description may aid a factfinder in conclusively deciding if McKinnon was indeed terminated for the reasons L-3 claims, this evidence suffices to show a genuine dispute of material fact.

L-3 further suggests that strong communication and relationship-building skills are uniquely "essential" to the job of an HR Director. (Defs. Br. at 35–36.) While it is true that certain skills may be more important in some positions than in others, the skills that L-3 identifies are essential to nearly every job, and certainly to every job that requires leadership and management of others. Moreover, McKinnon "need not demonstrate an exact correlation with the employee

receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *Ercegovich*, 154 F.3d at 352. A contrary rule would mean that, absent direct evidence of discrimination, "a plaintiff whose job responsibilities are unique to his or her position will *never* successfully establish a prima facie case." *Id.* at 353.

Finally, L-3 argues that to show pretext, McKinnon must establish not only that its asserted reasons for terminating her were false, but also "that retaliation was the real reason for the adverse action." (Defs. Br. at 37 (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)).) However, the plaintiff in *Tingle* could not demonstrate a genuine issue regarding whether her employer's proffered reason for firing her lacked a basis in fact, *see* 692 F.3d at 531, 533, and so it did not need to reach the question of whether her employer had a retaliatory motive. In any event, the quote from *Tingle* relied upon by L-3 cites *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993), which states what the plaintiff must ultimately show to prevail, not what is necessary to avoid summary judgment. *Tingle*, 692 F.3d at 530. As we explained in *Griffin v. Finkbeiner*, 689 F.3d 584, 594 (6th Cir. 2012),

> The question in *Hicks* was whether a showing of pretext "mandates a finding for the plaintiff," which is a different question from what a plaintiff has to show to survive summary judgment. . . . Evidence that the employer's proffered reason for the termination was not the actual reason thus does not mandate a finding for the employee, but is enough to survive summary judgment. The jury can decide whether [the proffered reason] was the actual reason for [the employee's] termination.

*Id.* (citations omitted) (quoting *Hicks*, 509 U.S. at 504) (citing *Hicks*, 509 U.S. at 511; *accord Blair v. Henry Filters*, 505 F.3d 517, 532 (6th Cir. 2007), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 n.4 (2009)); *see also, e.g.*, *Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x 472, 479 (6th Cir. 2017); *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 608–10 (6th Cir. 2013). Thus, "to survive summary judgment a plaintiff need only produce enough

evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin*, 689 F.3d at 593 (quoting *Blair*, 505 F.3d at 532). A plaintiff need not necessarily produce any additional evidence to show that retaliation was the real reason for the adverse action. *See id.*

Regardless, even if we were required to hold McKinnon to that standard, she has produced additional evidence suggesting that the catalyst for her termination was her complaint of gender discrimination. In her deposition, McKinnon explained that she was subjected to other retaliatory conduct after she made her complaint, including being denied leadership roles, excluded from meetings, having her bonus reduced, and more. (McKinnon Dep., R. 22 at PageID ##173–76; *see also* McKinnon Dep. Ex. 48, R. 22-5 at PageID ##443–45.) Further, she has presented evidence that other women who have complained of gender discrimination have also feared, claimed, and evidenced retaliation. (Connolly Dep., R. 32 at PageID ##1486–88.) This evidence, combined with the fact at least one employee with similar management duties was not terminated for his comparable leadership and communication issues, suffices to demonstrate a genuine dispute of material fact as to whether L-3's asserted reason for terminating McKinnon was pretextual.

Thus, McKinnon has demonstrated a genuine issue of material fact as to each of the two disputed elements of her Ohio state law retaliation claim. Summary judgment was therefore not warranted on that claim.

## II.  Motion to Reconsider

Finally, we turn to McKinnon's motion to reconsider. Before the jury handed down its verdict on her gender discrimination claim, McKinnon asked the district court to reconsider its grant of summary judgment on her retaliation claims based on new evidence that came out at trial. The district court denied her request. As the district court erred in granting summary judgment to

L-3 on McKinnon's Ohio state law retaliation claim, we need not also reach the question of whether it erred in refusing to reconsider that decision. Instead, we ask only if the court erred in refusing to reconsider McKinnon's FLSA retaliation claim. We conclude that it did not.

When a district court refuses to consider new evidence produced for the first time on a motion to reconsider, we review that decision for an abuse of discretion. *Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003). We generally also review the denial of a motion to reconsider for an abuse of discretion, but where a party seeks reconsideration of a grant of summary judgment, we apply *de novo* review. *Id.* Because McKinnon seeks reconsideration of summary judgment based entirely on new evidence, if the district court did not abuse its discretion in refusing to consider that evidence, our *de novo* review of its grant of summary judgment mirrors our initial consideration of that decision. That is the case here.

We begin by assessing whether the district court abused its discretion by refusing to consider each piece of evidence McKinnon identifies. McKinnon first notes Plaintiff's Exhibit 24, a March 16, 2015 email from Walker to McKinnon's executive coach. In that email, Walker states that Miller and Park "do not think [McKinnon] is going to make it at L-3" and that the two "believe that I should talk to [McKinnon] frankly and explain it is not working out and work a transition while we look for someone new." (Doc. No. 28 at Appx-11.) According to McKinnon, this email shows that Walker was not the sole decision-maker regarding her termination and draws a closer connection to the calls in which she raised the FLSA reclassification issue.

The district court did not err in refusing to admit this evidence. At most, this email was probative as to whether McKinnon's seeking overtime pay for Neal caused her termination. But under the district court's reasoning—and under ours—McKinnon's FLSA claim would fail regardless of whether she showed causation, because her efforts were not protected activity under

the FLSA. Thus, this email would not have affected the district court's ultimate conclusion and excluding it was not an abuse of discretion.

Second, McKinnon points to testimony Worsham provided at trial suggesting that multiple people needed to agree to terminate her and that this agreement was not reached until fall 2015. Again, the district court did not abuse its discretion in refusing this evidence. The only reason McKinnon could not present similar deposition testimony from Worsham prior to summary judgment was her own decision to agree with L-3 that "Mr. Worsham will not support any dispositive motion by way of an Affidavit or statement." (Defs. Resp. Mot. for Surreply Ex., R. 48-2 at PageID #1896.) This evidence would have been available to McKinnon but for her own election not to pursue it. Moreover, L-3's answers to interrogatories also stated that multiple people played a role in the decision to terminate McKinnon, making this evidence cumulative. (*See* Neff. Aff. Ex. A, R. 36-1 at PageID #1653.)

Finally, McKinnon notes her own trial testimony affirming that she told Worsham during the May 27, 2015 phone call that she believed she was being harassed based on her gender. But this evidence was clearly available to McKinnon prior to summary judgment, and it is not an abuse of discretion for the district court to refuse to consider testimony that McKinnon could have provided in her prior affidavit, deposition, or both. *See Sommer*, 317 F.3d at 691.

Without the benefit of new evidence, our *de novo* review of the district's court decision not to reconsider her FLSA retaliation claim yields the same result as our review of the district court's grant of summary judgment on that claim. Accordingly, we affirm the court's decision.

**CONCLUSION**

For these reasons, we **AFFIRM** the district court's grant of summary judgment on McKinnon's FLSA retaliation claim and its denial of her motion to reconsider that claim. We **REVERSE** the district court's grant of summary judgment on McKinnon's Ohio state law retaliation claim and **REMAND** this case for proceedings consistent with this opinion.