NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0080n.06

Case No. 25-5370

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 10, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| ANTHONY WARREN, | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| CHESTER COUNTY, TENNESSEE, | ) | DISTRICT OF TENNESSEE |
|     Defendant-Appellee. | ) | |
| | ) | O P I N I O N |
| | ) | |

Before: McKEAGUE, GRIFFIN, and MATHIS, Circuit Judges.

McKEAGUE, Circuit Judge. Anthony Warren worked for the Chester County Solid Waste Department collecting disposed cardboard. The County fired Warren, citing his use of profanity during interactions with supervisors and a looming budget cut. Because a reasonable jury could conclude that those reasons were pretextual, we **REVERSE** and **REMAND**.

**I.**

For about three months, the Chester County, Tennessee Solid Waste Department employed Anthony Warren as a truck driver. In that role, he was responsible for picking up disposed cardboard throughout the county. During his tenure, he was supervised by Solid Waste Director Amber Greene, Solid Waste Foreman Merrell Edgin, and Solid Waste Recycling Coordinator Shelly Fesmire.

All agree that Warren's employment was at-will and that he could be terminated with or without cause. Beyond that, they agree on little. The County claims that Warren was a part-time employee for the duration of his tenure. Warren maintains that he started in a part-time role but eventually transitioned to a full-time position. In recognition of that transition, Warren claims he received a $0.50 per hour pay bump. The County posits that Warren's pay was increased because he was promised a higher rate during his interview, not in recognition of full-time employment status. At least at first, whether full or part time, everyone seemed satisfied with Warren's work. Indeed, Greene testified that Warren was "a great employee," and Edgin "never had a cross word" or "complaint" about Warren. Greene Dep., R. 34-1 at PageID 467; Edgin Dep., R. 34-4 at PageID 664.

Eventually, however, the parties' relationship began to sour. First, Greene informed Warren that he was failing to deduct an unpaid lunch break when recording his hours on his timesheet. That confused Warren, because he claims Edgin directed him to work through lunch to keep up with the demanding workload. Second, Warren claims that he needed to work more than 40 hours a week to keep up with increased cardboard volumes at local schools that coincided with the end of the academic year. And—despite accurately logging those hours and informing Greene that he worked extra time—he claims Greene refused to pay him overtime because of budget constraints. Although he acknowledges his timesheets reflect less than 40 hours, Warren points out that Greene had been redoing and sometimes fully completing his timesheets. Indeed, several of Warren's timesheets include Greene's handwriting.

The County sees things differently. To its mind, Greene's changes to Warren's timesheets were not improper. Warren repeatedly made mistakes when completing his timesheets and, as a result, needed assistance from Greene and Fesmire. While the County acknowledges that Warren's

timesheets frequently required modification because of errors, whenever changes were required, Greene contends that Warren "sat in the room with [her]" and approved each change. Greene Dep., R. 34-1 at PageID 488. Additionally, the County points out Warren was aware that its policies mandated each employee take an unpaid lunch break, and that Edgin never told Warren to disregard that requirement. At bottom, it claims that Warren never worked more than 40 hours in a week; indeed, both Greene and Edgin testified that "[n]obody stays and works overtime or extra hours," including Warren. *Id.* at PageID 489; *see* Edgin Dep., R. 34-4 at PageID 733-34.

The dispute boiled over when, according to Greene, she overheard Warren get "upset and cuss" while discussing his time-sheet-related confusions with Fesmire. Greene Dep., R. 34-1 at PageID 491. During the conversation, Greene contends that Warren labeled the County's time tracking process as "bullshit." *Id.* at PageID 491-92. Because of Warren's behavior, Greene claims she called Edgin on the phone to ask him to come in so there was "someone else [there] in the office with [them]." *Id.* at PageID 492, 574. When he picked up the phone, Edgin contends that he could hear Warren yelling "erratic[ly]" and "cursing," and that when he arrived to the office, he heard Warren lodge more profanity towards Greene and Fesmire. Edgin Dep., R. 34-4 at PageID 665-67, 728. And another employee, Thomas Reed, avers that he also heard Warren "yelling angrily" and cursing at Fesmire. Reed Affidavit, R. 33-5 at PageID 134-35. Fesmire, for her part, testified only that Warren "got aggravated" and "stormed out of the office" when discussing timesheet issues with her, but that was the "only thing that stuck in [her] head." Fesmire Dep., R. 34-5 at PageID 778-80.

Warren's outburst resulted in a formal verbal warning. According to Greene, a warning was necessary because "not only did [Warren] cuss, he was very upset, and he would not calm down and listen." Greene Dep., R. 34-1 at PageID 496. The warning is memorialized in a document

signed by Greene, but not by Warren. Greene claims that Warren refused to sign the document, and it was not the County's policy to require a signature. For his part, Warren asserts that he did not yell or use inappropriate language during his encounter with Fesmire, and he seems to contend that the warning document was fabricated after the fact, as exhibited by his missing signature.

About a week later, the parties' issues came to a head. Still confused about why he was not being paid for the hours he worked, Warren claims that he called Greene on a Friday evening, after work hours. During that call, both Warren and his wife tried to explain his confusion to Greene, and Warren expressed his belief that it was against the law not to pay him overtime, but Warren denies using any inappropriate language. In fact, he claims it was Greene that got agitated.

The County's version of events, unsurprisingly, is different. By Greene's telling, Warren's penchant for profanity continued during their phone call (which she answered in the car while with her children). Greene claims that Warren "used inappropriate language" in "front of [her] children." *Id.* at PageID 524.

Greene testified that she decided to fire Warren for his use of profanity, which she viewed as insubordination. In fact, soon after speaking with Warren, Greene called Edgin and said that Warren "had spoken very harsh" to her and that "she was going to call him in and let him go." Edgin Dep., R. 34-4 at PageID 697. Greene also says she informed Chester County Mayor Barry Hutcherson of her intention to fire Warren for insubordination based on his inappropriate behavior. But the Mayor's deposition testimony does not clearly reflect whether he was informed before or after Warren was fired.

The following Monday, Greene met with Edgin and Warren in her office. Greene claims to have set the meeting, while Warren contends Edgin initiated the conversation with Greene at his behest. In either case, the meeting was recorded. Warren reiterated his concerns about not being

paid for hours he worked. Recording, R. 43 at 1:28-1:41. Greene then asked, "how many hours" the Solid Waste Department owed Warren. *Id.* at 1:41-1:44. When Warren equivocated, she instructed him to look over his timesheets and let her know if he was owed any additional time. *Id.* at 2:15-2:47, 3:00-3:04. Then, Greene informed Warren that she was "letting [him] go at will . . . because [the County] [did not] need [him] any longer." *Id.* at 2:47-3:00. Warren's separation notice likewise explains that he was "discharged at will" because he was "no longer needed." Separation Notice, R. 38-2 at PageID 944. After Warren left the office, Greene continued her conversation with Edgin. She reiterated that Warren had used profanity, which led her to terminate his employment. Recording, R. 43 at 3:11-5:28. She also indicated that she was "upset Friday about timesheets" when she spoke to Warren and acknowledged that firing Warren "put [them] in a bind" and that she was going to call another individual to see if he wanted to work. *Id.* at 3:23-3:26, 3:38-3:43.

The County later claimed that Warren was terminated for an additional reason—a forthcoming budget deficit. At the time Warren was terminated, both Greene and Edgin knew that Solid Waste was facing a budget cut in the next fiscal year, which was set to begin two weeks later. While the County had previously imposed a fee on residents in an effort to close the budgetary gap, the funds collected were insufficient, so Solid Waste was facing a significant revenue loss. When Warren was fired, Solid Waste knew it was facing a financial deficit, even if the parties dispute the genesis of Solid Waste's financial woes or how much it would need to tighten its belt.

Eventually, Warren sued the County, alleging that his termination constituted retaliation under the Fair Labor Standards Act ("FLSA"). The district court granted the County's motion for summary judgment. It found that Warren had offered no direct evidence of retaliation. Under a

circumstantial evidence theory, it found that Warren had made out a prima facie case of retaliation and concluded that fact disputes existed as to the County's insubordination justification. Nonetheless, it concluded that Warren had not carried his burden of demonstrating that the County's budget explanation was pretextual.

This appeal followed.

## II.

We review a grant of summary judgment de novo. *Capen v. Saginaw County*, 103 F.4th 457, 461 (6th Cir. 2024). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Record evidence is viewed in the light most favorable to Warren and all reasonable inferences are drawn in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

The FLSA prohibits an employer from retaliating against an employee for engaging in certain protected activities, including "fil[ing] any complaint." 29 U.S.C. § 215(a)(3); *Rogers v. Webstaurant Store, Inc.*, 774 F. App'x 278, 279 (6th Cir. 2019) (citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 4 (2011)). An employee can demonstrate retaliation by either direct or indirect evidence. *See Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006); *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 235 (6th Cir. 2017).

Warren proceeded on both tracks. And while he failed to offer direct evidence of retaliation, there is sufficient circumstantial evidence in the record to preclude summary judgment for the County.

**A. Direct Evidence**

Warren first argues that the district court improperly disregarded direct evidence of retaliation. "'Direct evidence is that evidence which, if believed, *requires* the conclusion that unlawful behavior was at least a motivating factor in the employer's actions.'" *Mansfield*, 706 F. App'x at 235 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (alterations omitted)); *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 534 (6th Cir. 2011). Put differently, "[d]irect evidence proves the existence of a fact without any inferences or presumptions." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) (citation modified). So, under a direct evidence theory, an employee must point to evidence of "blatant remarks" revealing a retaliatory intent and show that such an intent "was a motivating factor" in his termination. *Mansfield*, 706 F. App'x at 235-36 (citation modified); *Gohl v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016) (describing direct evidence as a "smoking gun" which "explains itself" (citation modified)). But, if an inference is necessary to conclude that an employer acted with retaliatory intent, a statement does not constitute direct evidence. *Abbott*, 348 F.3d at 542.

Gauged by those standards, Warren's proffered evidence does not qualify as direct evidence. He points to a statement by Greene that she apparently made when he was terminated: "Well, I'll make sure you get these hours. And as of now, we no longer need you." Warren Dep., R. 34 at PageID 254. The recording of the encounter reveals slightly different phrasing. After discussing his alleged unpaid overtime and asking Warren to confirm all the time he was owed, Greene said, "So, I'm letting you go at will and discharging you, because we don't need you any longer." Recording, R. 43 at 2:47- 2:53.

In either form, the statement requires an inference of retaliatory intent. Greene does not say that she fired Warren *because* he had complained about being underpaid. Standing alone, to reach Warren's desired conclusion, an assumption that Greene acted with a retaliatory motive is required. Yet, it is also plausible that Greene wanted to ensure that Warren was paid what he was due before discharging him because of his alleged insubordination or budgetary constraints. *See Pettit*, 429 F. App'x at 534 (rejecting direct evidence argument when proffered evidence permitted multiple inferences, some of which were permissible reasons for termination). At bottom, "[t]he fact that an inference is required to get from" Greene's statement to her alleged motive "disqualifies" the statement as direct evidence of retaliation. *Id.*; *Mansfield*, 706 F. App'x at 235-36.

Warren's argument to the contrary is unpersuasive. He relies on non-binding decisions from district courts or other circuits with inapposite facts. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1217 (10th Cir. 2013) (finding direct evidence of gender discrimination where an employer "explicitly stated a view that women have inferior knowledge of tools and inferior ability to sell tools"); *Equal Emp. Opportunity Comm'n v. Proctor Fin., Inc.*, No. 19-cv-11911, 2021 WL 4478929, at *7 (E.D. Mich. Sept. 30, 2021) (finding that the evidence "reflect[ed] a clear intent to terminate or at least take some adverse employment action against [an employee] in response to her protected activity"); *Su v. Ikes Artisan Pizza, L.L.C.*, No. 6:22-cv-00217, 2024 WL 3432218, at *4 (E.D. Ky. July 15, 2024) (finding direct evidence where an employer told an employee he had knowledge of the employee's complaint, informed the employee that "he did 'not need that here,'" and told the employee he was "no longer welcome to work for [him] or [his] future companies"). Standing alone, retaliatory intent is not apparent from Greene's statement. And the temporal connection between Greene's statement and Warren's termination—while relevant to his prima facie case—does not transform the statement into direct evidence. *Pettit*, 429 F. App'x at

534; *see Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (explaining relevance of temporal proximity in establishing prima facie case of retaliation). In sum, the district court properly concluded that Warren failed to offer direct evidence of FLSA retaliation.

### B. Indirect Evidence

Absent direct evidence, Warren can still create an inference of retaliation under the burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Adair*, 452 F.3d at 489. To do so, an employee must first establish a prima facie case of retaliation, which "creates a presumption that the employer unlawfully discriminated against the employee." *Id.* (citation modified). If the employee "establishes a prima facie case, the burden then shifts to the [employer] to set forth a legitimate, non-discriminatory reason for the adverse employment action." *Id.* "If the [employer] carries [its] burden, the [employee] then must prove by a preponderance of the evidence that the [employer's] proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Id.*

#### 1. Prima Facie Showing

"To establish a prima facie case of retaliation, an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* The County contends that Warren did not engage in a protected activity, he did not put the County on sufficient notice of his protected activity, and there was not a sufficient causal connection between Warren's protected activity and his termination. None of those arguments is persuasive.

### i. Protected Activity

The County first argues that Warren did not engage in protected activity because his belief that the County violated the FLSA by failing to pay him for all the hours he worked was unreasonable. In the retaliation context, an "employee engages in protected activity when he opposes employer practices that the employee reasonably believes are in violation of the statute." *Browning v. Franklin Precision Indus., Inc.*, No. 23-5406, 2023 WL 8437235, at *3 (6th Cir. Dec. 5, 2023); *see Bacon v. Honda of Am. Mfg., Inc.*, 192 F. App'x 337, 342-43 (6th Cir. 2006) ("To support a retaliation claim, the opposed practice need not actually violate [a statute]; rather, the employee must have 'reasonably believed it to be a violation of [the statute].'" (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (alterations omitted))). An informal complaint qualifies as a protected activity under the FLSA. *Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004); *E.E.O.C. v. Romeo Cmty. Schs.*, 976 F.2d 985, 989–90 (6th Cir. 1992) (per curiam) ("It is the assertion of statutory rights which is the triggering factor, not the filing of a formal complaint."). And, relevant here, the FLSA requires an employer to pay overtime rates when an employee works more than 40 hours a week. *See* 29 U.S.C. § 207(a).

Against that backdrop, the County argues that, because Warren never worked more than 40 hours, he could not have reasonably believed that the County violated the FLSA. Looking to the record, the County points to Warren's timesheets, none of which total more than 40 hours. And, when confronted with that evidence, Warren seems to acknowledge none of the timesheets produced by the County reflect overtime work. Moreover, several County employees testified that Warren's work should not have required him to work overtime, and those same employees deny assigning Warren extra work.

But, according to Warren, the timesheets and deposition testimony do not paint the full picture. First, although it seems Warren eventually conceded that his lunch break was properly unpaid, he insists that Edgin initially instructed him to work through his lunch and he logged his hours accordingly. Second, he testified that he was required—indeed, instructed—to work beyond his scheduled shift when extra refuse was being disposed at the local schools. Although Warren logged those extra hours on his timesheet, at some point he "noticed they [were not] there" and "said something" to Greene. Warren Dep., R. 34 at PageID 239. In fact, he claims he explicitly told Greene she was violating the law by failing to pay him overtime. Moreover, the evidence suggests that Greene and Fesmire were largely completing Warren's timesheets, even if the parties disagree on the reasons why. On this record, the district court correctly determined that a fact dispute exists as to whether Warren reasonably believed the County was improperly refusing to pay him in violation of the FLSA.

### ii. Notice

The County next argues that Warren stumbles at the second prima facie requirement because he "failed to give notice to the [County] of any alleged protected activity he engaged in." Appellee Br. at 34. In support, it suggests that Warren has offered little clarity or detail as to what overtime he worked. "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten*, 563 U.S. at 14. An employee's complaint must take on "some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." *Id.*

Warren raised concerns with Greene about not getting paid for the hours he worked. It is true, as the County points out, that Warren is short on details. For example, he offers no specifics on which days he worked extra hours at the schools, testifying only that he was "there, like, for hours." Warren Dep., R. 34 at PageID 238. But, at the very least, he did inform Greene that he "didn't understand why [he] wasn't getting paid for the overtime hours," which he believed "was against the law." *Id.* at PageID 245-46. *See Romeo Cmty. Sch.*, 976 F.2d at 989 (finding an employee's FLSA retaliation complaint sufficient where she "protest[ed]" to her employer and said they were "breaking some sort of law"). And during their recorded encounter, Greene seems to acknowledge Warren's complaints, which cuts against any argument that his grievance was unclear. Recording, R. 43 at 2:15-2:47, 3:00-3:04.

The County contends Warren needed to say more. But the standard set out in *Kasten* only requires that a complaint be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten*, 563 U.S. at 14; *see, e.g.*, *Caudle v. Hard Drive Express, Inc.*, 91 F.4th 1233, 1238 (6th Cir. 2024) (applying *Kasten*). So, in a retaliation case, the notice requirement asks only whether an employee gave "fair notice that she [was] actually complaining about overtime or a lack of fair compensation, i.e. the core things the FLSA protects." *Rogers*, 774 F. App'x at 280-81 (citing *Kasten*, 563 U.S. at 14) (emphasis omitted). On balance, while Warren's testimony is no doubt thin on detail, his complaints can reasonably be viewed "as an assertion of rights protected by the statute and a call for their protection." *Kasten*, 563 U.S. at 14.

### iii. Causation

Finally, the County's argument concerning causation is unpersuasive. At the outset, the County argues that any showing of causation is undermined by "the proof in this matter" which

"clearly establishes" that Warren's insubordination and forthcoming budget cuts caused his termination. Appellee Br. at 37-38. That argument falters because, as discussed below, each of its proffered justifications is mired by factual disputes.

Even still, the County argues that Warren's reliance on the temporal proximity between his alleged protected activity and his termination to establish causation is inadequate. And it is true that we have found such a showing, in some cases, to be insufficient. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000). But our cases also recognize that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey*, 516 F.3d at 525; *id.* at 528-29 (Batchelder, J., concurring) (collecting cases and noting that "*Nguyen* should be read as leaving the door open very slightly for a finding that in a case in which the employer's learning of the protected activity is so closely followed by the employer's taking of an adverse action that the two are virtually contemporaneous—exactly the circumstances in this case—the temporal proximity between the two is alone sufficient to establish the causal connection necessary for the fourth prong of a prima facie case of retaliation"). And at this stage, a plaintiff's burden in establishing causation "is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (citation modified).

Here, Warren lodged his concerns with Greene about his pay during a Friday evening phone call. First thing the following Monday morning, he re-registered those concerns. Shortly thereafter, on the same day, he was terminated. And, timing aside, the recording of the termination

meeting seems to indicate that Greene was "upset Friday about timesheets." Recording, R. 43 at 3:23-3:26. Although there is evidence to support the County's claim that Warren was fired for insubordination, Warren presents other evidence—principally his own testimony—that draws into genuine dispute whether he was insubordinate towards Greene during the Friday call. On this record, Warren's case falls closer to cases like *Mickey* than *Nguyen*, and he has produced sufficient evidence to create a fact dispute concerning causation. That is particularly true because "the burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Mansfield*, 706 F. App'x at 237-38 (citation modified).

In sum, the district court properly concluded that genuine issues of fact exist as to whether Warren engaged in protected activity, whether the County was on notice of that activity, and whether there was a causal connection between the protected activity and Warren's termination. Warren made out a prima facie case of FLSA retaliation.

### 2. Legitimate, Non-Retaliatory Reasons

At step two, the County offers two legitimate non-discriminatory reasons in support of Warren's termination: Warren's apparent insubordination as exhibited by his use of profanity toward his supervisors and a forthcoming budget deficit. Those justifications—if true—would qualify as legitimate justifications supporting Warren's termination. *See Patterson v. Kent State Univ.*, 155 F.4th 635, 646 (6th Cir. 2025) (profanity); *Terre v. Hopson*, 708 F. App'x 221, 225 (6th Cir. 2017) (budgetary constraints).

### 3. Pretext

Nonetheless, Warren contends that the County's proffered justifications are pretextual. His argument proceeds on two tracks. First, he argues that the County's shifting rationales alone demonstrate pretext. Second, he contends that he has offered sufficient evidence to individually

show the County's proffered justifications were pretextual. While his first argument falters, his second is persuasive.

### i. Shifting Justifications

Start with Warren's argument that the County's shifting justifications—standing alone—demonstrate pretext. As Warren sees it, the County's "story changed each time [it] was pressed." Appellant Br. at 18. True, as this litigation has proceeded, the County's reasons for firing Warren have changed. And, to be sure, an "employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996). But an employer is allowed to supplement its explanations for terminating an employee. *Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476, 481 (6th Cir. 2012); *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 891 (6th Cir. 2020). So, "providing additional non-discriminatory reasons that do not conflict with the one stated at time of discharge" is permissible, particularly when an employer does not "abandon its initial hiring justification in lieu of another conflicting reason." *Solis v. Ohio State Univ. Wexner Med. Ctr.*, No. 24-3230, 2024 WL 4579501, at *5 (6th Cir. Oct. 25, 2024) (citation modified).

Warren's insubordination and the budget shortfall are best viewed not as "conflicting reason[s]" for firing Warren, but "additional, permissible explanation[s]." *Id.* Greene initially stated that the County "no longer need[ed] [Warren]." Warren Dep., R. 34 at PageID 254. And Warren's termination notice indicated that he was "discharged at will" and "no longer needed." Separation Notice, R. 38-2 at PageID 944. At the time he was fired, the County needed to provide no further explanation.

The County's later justifications are consistent with its earlier account. After Warren sued, the County first pointed to Warren's alleged profanity as the reason for his termination. Later, the

County supplemented its discovery responses and indicated that budget shortfalls justified Warren's termination. Neither of those justifications are inconsistent with Greene's original statement that the County "no longer need[ed]" Warren. Warren Dep., R. 34 at PageID 254. *Miles*, 946 F.3d at 891 ("[The employer's] proffered rationales do not conflict with the reason stated at the time of discharge because [the employer] provided *no reason* at the time of discharge."). Moreover, the County pressed both positions below and continues to advance both contentions on appeal. Much as in *Gaglioti*, where an employer initially offered one explanation for terminating an employee, then offered a second explanation as the litigation proceeded, the County's budget justification is best viewed as supplementing its reasons for terminating Warren, not shifting them. 508 F. App'x at 481. Even if the budget justification's timing is "suspicious," that is "not enough by itself to create a disputed issue of material fact" as to pretext. *Id.*

### ii. Individual Justifications

But that is not the end of the road because there is "sufficient evidence in the record to create a dispute of material fact over each of the proffered justifications, taken individually, for [Warren's] termination." *Id.* To demonstrate that a proffered reason for termination is pretextual, an employee "must show that (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate [the employer's] action, or (3) the proffered reason was insufficient to motivate the action." *Adair*, 452 F.3d at 491; *Patterson*, 155 F.4th at 647. Put differently, to "survive summary judgment, [an employee] must produce sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him]." *Miles*, 946 F.3d at 888 (citation modified). Whether a stated justification is pretextual "is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* (citation modified). On that score, Warren has mustered enough evidence to create questions of fact.

### i. Profanity

Both of Warren's alleged uses of profanity are the subject of genuine fact disputes. As to the first, while Greene, Edgin, and Reed state that Warren yelled and swore at Fesmire during a meeting in the office, Warren disputes those accounts in his deposition. He claims that he never used profanity, and while he must move beyond mere allegations at this stage, his "testimony is sufficient to create a genuine dispute of material fact that forecloses summary judgment." *Moran v. Al Basit LLC*, 788 F.3d 201, 206 (6th Cir. 2015); *Crouch v. Pepperidge Farm, Inc.*, 424 F. App'x 456, 460 (6th Cir. 2011) ("[E]ven if it was the only evidence disputing [the defendant's] claims, [plaintiff's deposition testimony] is sufficient to create a genuine issue of material fact and avoid summary judgment."). And if that were not enough, Warren's version of events enjoys some support from Fesmire's testimony, which did not indicate one way or the other whether he raised his voice or swore. Nor, for that matter, do Greene, Edgin, or Reed recall Warren using the same profanity. More to the point, the written warning allegedly documenting the first instance of insubordination lacks Warren's signature, and he claims he had never seen the document before his deposition.

The subsequent phone call between Greene and Warren is similarly mired by fact disputes. In raising his grievances, Warren claims he remained civil. Greene, however, testified that Warren used profanity during their conversation, which occurred in front of her children. So, at bottom, it is Warren's word against Greene's.

To be sure, there is some contemporaneous evidence to support Greene's account: she called Edgin to tell him what happened and inform him that she intended to fire Warren for insubordination. Yet that testimony only bolsters Greene's version of events; it does not resolve whether Warren used profanity during his call with Greene. And the County is explicit that

Warren's insubordination stems from his obscene outbursts and use of profanity. Appellee Br. at 38, 40, 56, 60, 64. Whether to believe Warren or Greene is a question for a jury. *Helphenstine v. Lewis County*, 60 F.4th 305, 314 (6th Cir. 2023) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, when ruling on a motion for summary judgment." (citation modified)).

The County's evidence is compelling, and a reasonable jury may ultimately credit its version of events. But a jury could also believe Warren's testimony that he did not swear on the phone call with Greene or during his meeting with Fesmire, and if it did, it could conclude that Greene's proffered insubordination justification "had no factual basis." *Adair*, 452 F.3d at 491. In the end, "[f]or [an employee's] challenge to the factual basis of an employer's proffered termination rationale to establish pretext, the [employee] must provide evidence that the employer's allegations never happened." *Miles*, 946 F.3d at 888–89. At this stage, the district court correctly concluded that a jury could make that determination.

### ii. Budget Cuts

Contrary to the district court's conclusion, the proffered budget justification is also tainted by a dispute of fact. The County contends that the Solid Waste Department was facing an imminent budget shortfall, that Greene and Edgin were aware the department was in financial straits, and that, because of the cuts, Warren would need to be terminated in the near future. And the record is replete with evidence backing up those claims. Indeed, Warren does not seem to take issue with the general proposition that Solid Waste was in a tough financial position. With all those facts in mind, the County argues that "the proof in this matter clearly shows that [Warren] has no evidence to rebut the [County's] budgetary rationale for his termination." Appellee Br. at 62. The district court agreed.

But, even accepting the fact of a forthcoming budget cut, Warren has pointed to sufficient evidence to call into question whether the budget shortfall motivated his termination. He relies primarily on Greene's deposition testimony: when asked why the budget justification was not disclosed in the County's initial discovery responses, Greene responded that "[i]t's not something that [she] would have thought to put in [t]here because [she] *didn't let him go for that reason.*" Greene Dep., R. 34-1 at PageID 543 (emphasis added). If that were not enough, when asked directly whether she terminated Warren "because . . . of the budget," Greene responded, "No." *Id*. She explained that while she "would have let [Warren] go anyway two weeks later because [the County] didn't have the money to pay him," his insubordination "sped up the process." *Id*. A reasonable jury could consider that testimony and decide that the budget cuts did not actually motivate Warren's termination, a conclusion bolstered by the lack of contemporaneous evidence tying Warren's termination to the County's budget. And, testimony aside, the County injected the budget justification late in the litigation process. Even if insufficient standing alone to demonstrate pretext, adding the budget rationale late in the game might "allow the jury to view the [budget] argument as a litigation strategy, as opposed to the real reason for the action." *Gaglioti*, 508 F. App'x at 482.

In the end, Warren need not disprove the County's contention that the budget cuts justified his termination, "he simply has to show that it would be reasonable for a juror not to believe [the County's] claim." *Id.* A jury could reasonably conclude that the County's budget shortfall "did not actually motivate" Greene's decision to terminate Warren when she did, and that factual dispute precludes summary judgment. *Adair*, 452 F.3d at 491.

The County pushes back, arguing that Greene's statements must be read in context. True, Greene mentioned the County's budget shortfall during her testimony, testified that it was

"significant," and even acknowledged that Warren's termination was "about the budget, too." Greene Dep., R. 34-1 at PageID 543-44. And that evidence, no doubt, would make this a closer question for a jury. Yet, none of Greene's additional testimony changes the fact that when asked directly whether she terminated Warren because of the budget, she responded in the negative. *Id.* at PageID 543. Even with Greene's additional explanation, the question remains "whether a juror could reasonably conclude that [an] inconsistency" in Greene's testimony "is enough to discredit [the County's] account," not "whether there are ways to square" the testimony. *Gaglioti*, 508 F. App'x at 482.

The County also points out that Warren would have been fired two weeks later due to the budget cuts. Even accepting that premise, it does not move the needle. The relevant question is whether the County was justified in firing Warren when it did, not whether it would have been justified if it fired him at some point in the future. Indeed, implicit in Greene's testimony that Warren's alleged insubordination "sped up the process" of his termination is an admission that Warren was not fired when he was because of the budget cuts. Greene Dep., R. 34-1 at PageID 543. More to the point, Greene can be heard on the recording after firing Warren suggesting that she intended to bring in another employee to fill Warren's spot, even if only temporarily. Recording, R. 43 at 3:38-3:43. On this record, a dispute of fact exists as to whether the County's budget cuts "actually motivate[d]" Warren's termination. *Adair*, 452 F.3d at 491. So we reverse the district court's grant of summary judgment in favor of the County.

On remand, however, the case remains narrow. Even if a jury concluded that the County retaliated against Warren, his damages would be quite limited. Warren seeks back pay, lost benefits, other pecuniary losses, compensatory damages, and punitive damages. But Warren was hired by a different company the day after he was terminated, making more money than he did at

Solid Waste, albeit with a longer commute. Although a jury might conclude that the County impermissibly fired Warren on June 13, the record indicates that he would have been legitimately terminated two short weeks later due to impending budget cuts. And Warren offers no evidence to rebut Greene's or Edgin's testimony that Solid Waste would soon lack the funds to keep him employed once the new budget was in place. Far from it, Warren admits he "has no personal knowledge of [Solid Waste's] budget." R. 38-1 at PageID 921. So any jury award must consider that Warren's tenure at Solid Waste was coming to an end regardless of any alleged insubordination.

## IV.

All told, a jury could reasonably conclude that the County's proffered justifications were pretextual and that Warren was fired for lodging his FLSA-based complaints. Accordingly, we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.